(No. 54462.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. NOLA JEAN WEAVER, Appellee.

*Opinion filed October 22, 1982.*

WARD, J., took no part.

Tyrone C. Fahner, Attorney General, of Springfield, and Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko, of the State's Attorneys Appellate Service Commission, of Elgin, of counsel), for the People.

Neville, Pappas & Mahoney, Ltd., of Chicago (Ronald F. Neville, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

Defendant, Nola Jean Weaver, a high school physical education teacher, was convicted by a jury of the Lake County circuit court of the murder of her husband, Larry Weaver. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a).) She was sentenced to serve 40 to 60 years in prison. On appeal, the conviction was reversed and the cause remanded for a new trial. (90 Ill. App. 3d 299.) We granted the People's petition for leave to appeal and now affirm the appellate court's judgment.

Defendant's first contention is that she was not proved guilty beyond a reasonable doubt. Unlike many

contentions of this type that reach this court, her argument is not frivolous, and therefore it must be addressed with much care.

The evidence was entirely circumstantial. At approximately 1:30 a.m., on December 5, 1977, Cindy Goodfellow, the defendant's next-door neighbor, was awakened by the defendant, who was clad only in a nightgown and carrying her 9-year-old daughter, knocking loudly on the front door of the Goodfellow residence. Mrs. Goodfellow described the defendant as "full of panic and scared to death." The defendant told her there was a fire at her home and asked her to call the fire department and the police. She also said there were two men in her house with guns. The details of what the defendant said about these men, however, were, on the State's motion, excluded from Mrs. Goodfellow's testimony as hearsay. Mrs. Goodfellow said she called the fire department and then looked out her window at the Weaver home, but saw nothing unusual, only a dark house.

The police and fire department arrived shortly. Police officers testified that they entered the home through the slightly ajar sliding glass door, the one that the defendant and her daughter used in leaving the house. Finding the door to the master bedroom to be hot to the touch, they called in the firefighters. The firemen broke the bedroom window from the outside and entered through that window. They found the bed glowing with a smoldering fire, which they extinguished with a hand-held extinguisher and a stream of water from a 1½-inch fire hose. On the right side of the bed, the body of the defendant's husband, Larry Weaver, was found, lying on its back. He had been shot in the head.

Police looked around the house for evidence of what had happened. They found all the doors were locked from the inside except the sliding door the defendant had exited. There were no visible signs of tampering

with either the windows or the doors. Nothing in the house was disturbed; papers on the desk were stacked in neat piles. In the garage, they found two cars, a 1975 Ford and a 1973 Oldsmobile. An officer raised the hood and felt the engine blocks of both cars. The Ford was cold to the touch, but the Oldsmobile was warm. Inside the Oldsmobile, the floor around the driver's seat was wet, presumably from melted snow tracked into the car. Its seat was in a full forward position. It was later learned the victim was 6 feet tall and the defendant 5 feet and 7 inches. A thorough search of the house, including the basement and the crawl space, did not reveal any gun or .22-caliber ammunition, even though Larry Weaver was known to have owned a .22-caliber rifle at least as late as a month and a half before his murder. The car and the house were dusted for fingerprints. None were found. Outside, Mrs. Weaver's eyeglasses were found in the snow in the area of the yard closest to the Goodfellow residence. Although other footprints in the snow were also found by police leading from the back of the house to the garage, not the route the defendant would have taken in her escape, no casts were made.

The State theorized that the defendant killed her husband with his own .22 rifle while he was sleeping, with bullets she obtained herself, perhaps in Arkansas, a State that does not require a gun owner's license to purchase bullets. The family had spent Thanksgiving there. She then drove to some unknown place to dispose of the weapon and returned to burn his body. After starting the fire, she awakened her daughter and carried her over to the Goodfellow home. On her way to the Goodfellow's, aware that the fact she had her glasses on might be incriminating, she dropped them in the snow.

The State presented evidence that the defendant was unhappy in her marriage to the victim. The victim's sis-

ter testified that, a few weeks after the murder, the defendant told her that she had had an affair with the athletic director of the high school where she worked.

Evidence was also introduced that the defendant and her sister's husband, Dennis Johnston, shared some sort of a relationship which Judy Johnston, the defendant's sister, and Larry Weaver had attempted to put a stop to. On the witness stand, Dennis Johnston testified that he had been infatuated with the defendant, but because of the infatuation had moved out of the Weaver house, which he and his wife had shared with the Weavers during the summer of 1977 when the Johnstons first moved to Illinois. He also testified that on October 16, 1977, less than two months before the murder, on the day after he and his wife moved out, the Weavers came to visit them in their new apartment and that Mrs. Weaver had a red mark under her eye. The victim told him that he had beaten the defendant. He emphasized that he had beaten her, not just hit her. She had broken away from him and retrieved his rifle from the closet. According to the victim, neither he nor the defendant believed the rifle was loaded; the defendant was merely using it as a symbol. Mr. Weaver thought she was fully justified. When he grabbed the gun from her, however, it went off and a bullet lodged in the ceiling of the bedroom.

Police later found this bullet. It was not the same sort of bullet that killed the victim. The bullet used to kill the victim was copper covered, and manufacturers never mix such bullets. It was impossible to tell whether it was fired from the same gun. The State theorized that the defendant had to buy new bullets to kill her husband after this incident, because her husband threw away the bullets he had on hand.

Additionally, the State introduced evidence that the defendant would be financially benefited by her husband's death, or at least not substantially burdened. She

had a $70,000 insurance policy on his life. They owned the home they lived in, a Florida condominium and land in Arkansas and had other assets.

In order to prove that the defendant and no other actually committed the murder, the State called on Dr. Euphil Choi, the pathologist who examined the victim's body. He testified that a bullet wound from a copper-covered .22 bullet was the cause of death and that the victim had probably died instantly. From the stipplings around the bullet hole, Dr. Choi determined the gun was very close, near contact, to the victim's head. Because he did not know what sort of gun was used in the shooting, he was unable to state exactly how close the gun was. The doctor also stated that the fire was started "very close in time" after the shooting, but defined "very close in time" to mean anywhere from a minute to an hour. This was consistent with the State's theory that the defendant disposed of the rifle between the shooting and the burning. On cross-examination, however, he admitted that in his grand jury testimony he had stated that the burns to the body occurred immediately after death. The doctor was unable to say whether the body was sitting, standing, or lying when the shot was fired.

The State also called on Michael Johnson, chief chemist of the Northern Illinois Police Crime Lab. He testified that he removed charred material from the legs of the victim. Upon analysis, he found it to consist of three layers of fabric: the bottom pajama material, the middle layer sheet material and the top layer white blanket material. This, the State argued, was consistent with its theory that Larry Weaver was asleep when he was shot. On cross-examination, it was admitted that, when the firemen were extinguishing the fire, they tossed burned debris out the window and that conceivably they could have thrown the material analyzed on the bed. Photographs of the bed, however, show the body in what ap-

pears to be a restful position, and no evidence that fire-fighters threw debris on the bed is apparent. Moreover, a photograph of the bed after the body was removed reveals that Weaver was lying directly on the bottom sheet.

The defendant's nine-year-old daughter testified that on the evening before her father's death, at 6 or 7 o'clock, she went to choir practice at her church. She said that her father picked her up in her mother's car, although she did not specify the time. She said this was the last time the car was used that night. She then put on her pajamas and watched T.V. with her father, while her mother prepared play dough for her to take to school in the morning. Her parents did not bicker or fight. She went to bed at 9:30. The next thing she remembered was her mother waking her and taking her to the Goodfellow's house. She testified that her mother was crying and that she thought that she was wearing her glasses. The witness also testified that her father owned a rifle, but that it was kept unloaded. Previously, she said, it had been kept loaded, but her father had decided to keep it unloaded.

The defendant did not testify. She called no witnesses. Instead she asked for a directed verdict in her favor.

A valid conviction may be based entirely on circumstantial evidence. (*People v. Williams* (1977), 66 Ill. 2d 478.) It is necessary, however, that the proof be of a conclusive nature leading, on the whole, to a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Williams* (1977), 66 Ill. 2d 478.) We believe the State has met its burden in this case. The warm car-engine block, the car seat pulled up in a closer position than a person of the victim's height may have found comfortable, the missing rifle, and the evidence that the victim was under the bed covers could justify

the jury's verdict.

The defendant does, however, cite errors that require that she be given a second trial.

The first of these concerns the trial court's refusal to allow Mrs. Goodfellow, the defendant's neighbor, to testify regarding what the defendant told her about the two men with guns she said had shot her husband. Apparently all the jury learned of the defendant's story is the bare fact that she said she saw two men with guns.

The defendant makes various arguments in support of her position that the statements should have been admitted. We find one of them persuasive and therefore need not discuss the others.

She points out that the State was permitted to elicit from Mrs. Goodfellow selected statements made by the defendant. For example, Mrs. Goodfellow was allowed to testify that when she opened the door, the defendant said, "There is a fire, call the fire department and the police," and that there were two men in her home with guns. The defendant contends that by allowing the jury to hear only part of what she said, that they may have been misled into thinking that she had given no details about the men she claimed had entered her home. Under the circumstances, this may have made jurors more likely to believe that the story was false. A person whose spouse has just been murdered by two armed intruders is likely to say more about the matter than Mrs. Goodfellow's testimony indicated.

In *People v. Nakutin* (1936), 364 Ill. 563, 571, this court stated that "where a conversation is related by a witness the opposing party has a right to bring out all of the conversation on cross-examination." (Accord, *People v. Kalpak* (1957), 10 Ill. 2d 411, 424; *Biel v. Wolff* (1970), 126 Ill. App. 2d 209; *Dispenza v. Picha* (1968), 98 Ill. App. 2d 110.) In view of the possibility that the jurors would be misled into thinking that the defendant has

said nothing else, we believe the trial court should have allowed Mrs. Goodfellow to testify to the defendant's statement.

The defendant's second allegation of error concerned a failure by the State to provide discovery material. In response to a discovery request pursuant to Supreme Court Rule 412(a)(ii) (73 Ill. 2d R. 412(a)(ii)), the attorneys for the State supplied defense counsel with a copy of the grand jury transcripts. This, they indicated, contained all statements of the defendant in their possession. On the ninth day of the trial, however, the State called the victim's sister, Pat Weaver, to the witness stand. She testified that a few weeks after the murder, while the defendant was visiting the victim's family in Arkansas, the defendant's mother-in-law asked the defendant if she had had an affair with the athletic director at the high school where she worked and whether the victim and the athletic director's wife knew of it. According to Pat Weaver, the defendant replied affirmatively to both questions. Later, Pat Weaver spoke with the athletic director's wife and she denied having known of the affair. When Pat Weaver confronted the defendant with that denial, the defendant admitted that neither Larry Weaver nor the athletic director's wife had known.

Defense counsel asked that Pat Weaver's testimony be stricken or that a mistrial be declared. In chambers, the assistant State's Attorney said that she had known of the statement for about three weeks, but had inadvertently failed to inform defense counsel. She argued that defense counsel knew that Pat Weaver would testify and could have interviewed her prior to the trial. Defense counsel pointed out, however, that he was under the impression that Miss Weaver would testify as to her knowledge of Larry Weaver's financial situation. He had no idea her testimony would concern an admission of the

defendant. The next day the trial judge denied the defendant's motion. He offered to give defense counsel an opportunity to put Miss Weaver back on the stand and cross-examine her, and told defense counsel he would be given time to talk to her first. Defense counsel declined that opportunity, saying that he could not possibly remedy the damage that way.

The State's failure to inform defense counsel of the defendant's alleged admission was a violation of Rule 412(a)(ii), which requires the State to disclose upon written motion "any written or recorded statements and the substance of any oral statements made by the accused ***, and a list of witnesses to the making and acknowledgment of such statements." (73 Ill. 2d R. 412(a)(ii).) The rule encompasses not only formal statements made to the authorities but also statements made to anyone that might have bearing on the defendant's guilt or innocence. (See *People v. Greer* (1980), 79 Ill. 2d 103.) It is a continuing duty. The fact the State did not learn of the alleged admission until three weeks prior to trial did not negate the duty to disclose. (73 Ill. 2d R. 415(b).) Moreover, it is a violation whether or not the State's neglect was inadvertent or purposeful. See *People v. Shegog* (1976), 37 Ill. App. 3d 615, 617.

The real question here is whether the trial court erred in refusing to strike the evidence or grant a new trial. The appellate court held that it did and remanded the cause for a new trial. We agree with the appellate court's conclusion.

Rule 415(g) (73 Ill. 2d R. 415(g)) provides an array of sanctions against a party that has failed to comply with an applicable discovery rule. The trial court may order disclosure of the information, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances. In addition, if the attorney's violation is wilful, the court may subject the

attorney himself to sanctions. In general, the judgment of the trial judge is given great weight. (*People v. Wilken* (1980), 89 Ill. App. 3d 1124, 1128; *People v. De-Bord* (1978), 61 Ill. App. 3d 239, 242.) A reviewing court will find an abuse of discretion, however, when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate that prejudice. *People v. Millan* (1977), 47 Ill. App. 3d 296, 300. See, *e.g., People v Miles* (1980), 82 Ill. App. 3d 922; *People v. Boucher* (1978), 62 Ill. App. 3d 436; *People v. Young* (1978), 59 Ill. App. 3d 254; *People v. Szabo* (1977), 55 Ill. App. 3d 866; *People v. Shegog* (1976), 37 Ill. App. 3d 615.

The State argues that because the defendant's counsel did not accept the circuit court's offer to allow him to recall Pat Weaver for further cross-examination after having an opportunity to speak with the witness on the matter, and did not himself ask for a continuance, any claim of prejudice is negated. It cites *People v. Foster* (1979), 76 Ill. 2d 365, to support its contention. In that case, this court held that the State's failure to supply certain evidence to defense counsel pursuant to *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, under the circumstances of the case, did not make a new trial necessary. This court stated, "If that statement was so earthshaking as to require complete reorganization of the defendant's case, counsel should have asked for a continuance or recess for that purpose before [the witness] testified. His failure to do so is persuasive evidence that the prejudice here alleged was in fact trivial." 76 Ill. 2d 365, 384.

It should be noted that, in *Foster*, defense counsel was informed of the defendant's alleged admission on the morning the witness testified. There was time to request a continuance before the testimony was heard. It was the possibility of such a motion this court was referring to. In the case at bar, Pat Weaver had testified be-

fore it was possible to request a continuance. As the court acknowledged in *Foster,* each case must be decided on its own facts, and in this case we find the defendant's failure to accept a continuance not to be fatal to her position. See *People v. Foster* (1979), 76 Ill. 2d 365, 384.

Motive evidence was an important ingredient in establishing guilt beyond a reasonable doubt. Pat Weaver's testimony was extremely damaging in that it showed not only a motive for the defendant to kill her husband but also a willingness to lie to conceal that motive. Defense counsel informed the court that the defendant denies having made the statement. We cannot say that, given adequate time to investigate the matter before trial, the defendant's counsel would not have come up with evidence that would cast doubt on the truth or the proper interpretation of Pat Weaver's testimony. Perhaps even Pat Weaver herself could have been convinced that she misunderstood what the defendant said.

The State contends, however, that because the withheld evidence was inculpatory rather than exculpatory, the defendant should have to demonstrate specific prejudice in order to merit retrial. Again, the State is attempting to cast the issue in terms more simple than is justified. In fact, the issues are multifarious, and each case must be examined in order to determine whether the State's failure was harmless, just as in any other situation in which the ultimate question is one of harmlessness. The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial. The strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, the feasibility of continuance rather than a more drastic sanction, and the wilfulness of the State in failing to disclose are also factors which must be considered. While an indication of specific harm is helpful to a defendant in establishing that a discovery violation was

prejudicial, its absence is not decisive in itself.

In this case, defense counsel argued that if he had had the opportunity he would have taken a statement from Pat Weaver concerning the admission, interviewed Pat Weaver's mother, who was also present at the alleged admission, and any other individuals who should have seen Pat Weaver before or after the conversation. Because Pat Weaver said she was speaking to the defendant on the telephone when defendant recanted her statement that the victim and her paramour's wife knew of the affair, he could check to see if such a long-distance call was in fact made.

We believe the defendant's evidence of prejudice is sufficient. It need not be shown that in fact Pat Weaver's mother denies the conversation took place or in fact no telephone call was ever placed from Pat Weaver's home to the defendant during the period of time in question. While exclusion or mistrial are extreme sanctions not favored when an alternative exists (see, *e.g., People v. Petru* (1977), 52 Ill. App. 3d 676, 679), we cannot refuse to use them when they are the only effective sanction available.

On the basis of these two errors, we believe a new trial is necessary. Other errors that occurred at trial reinforce this conviction.

The defendant contends that the court should not have allowed evidence of her affair with the athletic director at her high school to be introduced at trial at all, quite apart from the fact that it was proved by means of an admission she was not informed of during discovery. She argues that this evidence of adultery was brought in only to discredit her and make her appear to be an evil woman in the eyes of the jury and not to prove motive for killing her husband. She points out that the State's Attorney stated at trial that this "was not the reason that defendant took her husband's life."

We believe that the defendant takes this statement out of context. The State's Attorney stated that the evidence was intended to show the defendant was "unhappy in the marital home." He apparently regarded it as illustrative of the defendant's progressive alienation from her husband. While it was not "the straw that broke the camel's back," it was an important step in that direction and as such could be proper motive evidence. See *People v. Foster* (1979), 76 Ill. 2d 365.

The defendant is quite right, however, in objecting to the State's failure to establish when the affair took place. If the affair had taken place 15 years ago and had lasted only a month, its value in showing that the defendant had reason to kill her husband is minimal. A love affair whose embers have long since cooled is not exactly a motive for murder. Its value is likely to be outweighed by the unfair prejudice against the defendant the evidence engenders. Furthermore, in the prosecutor's closing argument, he asserted the defendant's affair had lasted seven years. Not one shred of evidence appears in the record that suggested her affair spanned that period, and thus the defendant was correct to object. (See *People v. Beier* (1963), 29 Ill. 2d 511; *People v. Patterson* (1976), 44 Ill. App. 3d 894.) We see no merit in the State's argument that the fact could be inferred from other evidence.

The next contention of the defendant is that the court improperly designated Dennis Johnston as a court's witness and allowed the State to impeach him with his grand jury testimony, which the State sought to have the jury accept as substantive evidence.

The State attempted to prove that Dennis Johnston and his sister-in-law, the defendant, were having an extramarital affair and this in part motivated her to kill her husband. Dennis Johnston, who the State claimed was reluctant to testify and difficult to contact, was

called to testify. When asked, he stated that he had been infatuated with the defendant for a short time. At that point, the State moved to have Johnston designated as a court's witness and this request was granted. The State then proceeded to impeach Johnston's testimony with his prior grand jury testimony, which appeared to suggest that Johnston and the defendant had in fact been in love.

Later, during closing argument, the State argued, "He calls it an infatuation. Try in your common sense, who talked about infatuation in anything other than the past tense? He was in love with the woman. You heard the grand jury testimony read from the record, 'we were in love with each other.' "

We believe several errors took place here. Whether or not Dennis Johnston was properly made a court's witness, the State's ability to ask that a witness be designated a court's witness should not be used as a tool to bring hearsay testimony in as substantive evidence. The designation of a hostile witness as a court's witness is meant to allow a party to call an important witness whose truthfulness is in doubt without fear that if the witness says something that hurts the party's case, he won't be able to impeach him. Thus a court's witness can be impeached if he says something that damages the party's case and he can then be examined with leading questions.

A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the

witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful. See *People v. Johnson* (1929), 333 Ill. 469; *People v. Chitwood* (1976), 36 Ill. App. 3d 1017; McCormick, Evidence sec. 36 (2d ed. 1972).

In *People v. Johnson,* prior to trial, a witness told police that she had purchased a radio from the defendant, who was accused of a burglary in which a similar radio was taken. During the trial, however, she testified that she had bought the radio, not from the defendant, but from a friend of the defendant while in the defendant's presence. The testimony was still favorable to the State, although it was not as helpful as her pretrial statement. The court held that it therefore could not be impeached by the use of her prior statement and reversed the defendant's conviction.

In this case, Dennis Johnston testified that he had been infatuated with the defendant. This was not damaging to the State's case, since they had no admissible evidence indicating that Johnston was in love with the defendant. They had been relying on Johnston's testimony to establish this point, and he disappointed them. Impeaching his testimony, however, at best negated his testimony of an infatuation, which was favorable to the State, although not as favorable as evidence of a torrid affair. The State left itself with no evidence of a special relationship between the witness and the defendant. It seems clear to us then that the prosecution's only motivation for this would be to use the grand jury testimony as substantive evidence that they were lovers.

The error was compounded by the prosecutor's reference to the grand jury testimony in closing argument. The jury was clearly being requested to consider the testimony as substantive evidence of its truth. This it cannot do unless and until we decide that in this State such prior statements can be used against a defendant as sub-

stantive evidence. (See *People v. Collins* (1971), 49 Ill. 2d 179; *People v. McKee* (1968), 39 Ill. 2d 265.) The possibility of establishing such hearsay exceptions in Illinois was not argued, and we will not discuss them.

In view of our disposition of these issues, we need not discuss the remaining allegations of error made by the defendant. We affirm the appellate court's judgment of reversal and remand for a new trial.

*Judgment affirmed.*

JUSTICE WARD took no part in the consideration or decision of this case.