**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Spencer W. BROWN, Defendant and Appellant.**

**No. 16064.**

Supreme Court of South Dakota.

Considered on Briefs Nov. 29, 1988.

Decided Jan. 25, 1989.

Janine Kern, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghüisen, Atty. Gen., Pierre.

Donna K. Dietrich, Yankton, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

Defendant Spencer Brown (Brown) was charged with third-degree burglary after

Louise's Bar, in Volin, was burglarized in June 1987. After a jury trial in Yankton County, Brown was found guilty and sentenced to seven and one-half years in the State Penitentiary. This appeal followed, in which Brown alleges that the circuit court erred in four respects:

1) Testimony of Deputy James Vlahakis and Randall Flynn, a jailer, concerning prior inconsistent statements of witness Aldon Heckenlaible was improperly admitted;

2) Aldon Heckenlaible's statement that he and Brown were "going out robbing" was inadmissible hearsay;

3) Evidence was insufficient to support the jury's verdict; and

4) Brown's sentence of seven and one-half years in the State Penitentiary constituted cruel and unusual punishment.

We find no error and accordingly affirm.

## FACTS

At the time of the Volin burglary, Brown was eighteen years old. He shared an apartment with nineteen-year-old Aldon Heckenlaible, whom he had known for three years. Although Heckenlaible was employed as a dishwasher, the pair was so short of funds that their apartment's electricity was cut off for "a week or two" at the time of the events in question. On Sunday, June 14, 1987, Brown and Heckenlaible visited the house where Angie Heckenlaible (Angie), Aldon's sister, and Carol Martin (Carol), among others, lived. They arrived at 10 a.m. and stayed until somewhere between 9 and 10 p.m., except for a brief absence at approximately 7 p.m. At 2 p.m., Brown asked his younger sister, Marlene Brown, who had also arrived at the house, to give him two dollars for a "pop." This exchange was observed by both Angie and Carol, although, at trial, Heckenlaible denied that it occurred. After supper, Brown and Heckenlaible left together.

According to both Angie and Carol, Brown and Heckenlaible returned to the house at 3 a.m. on Monday, June 15. Heckenlaible borrowed a quarter from Angie to buy a pack of cigarettes. Brown and Heckenlaible then left the house. About two hours later, Brown and Heckenlaible arrived at the Fryn' Pan Restaurant, where Heckenlaible worked, for breakfast. They were flush with money and ordered steak and eggs for breakfast. Their bill, totaling $13.14, was marked "525" by their waitress, as she had given their order to the cook at 5:25 a.m. Brown paid for the meal. The waitress testified that they usually ordered only a roll and coffee, and paid with a dollar bill. The two returned to Angie's residence at approximately 7:30 a.m.

Later that morning, they purchased a muffler for $28. This muffler was installed in Heckenlaible's car, at "TMA," for $74.20, a bill which Brown paid in cash. While the car was worked on, Heckenlaible purchased "a couple" of cassette tapes for $11 each. After recovering Heckenlaible's car, they drove back to Angie's home, where they gave a total of $10 to Angie and Carol for the women to rent a video cassette recorder. Heckenlaible apparently provided Carol with $5, and Brown gave Angie $5. At that time, Angie testified that Brown had eight dollar bills remaining in his billfold.

Meanwhile, in Volin, Larry Nickles discovered that the bar he owned and operated had been burglarized that night. The burglar had forced a hole in the back door, removed a security bar, taken $175 to $200 from the cash register, and stolen five packs of Marlboro cigarettes from a stand near the register.

Two days later, on Wednesday, June 17, Carol Martin talked to Brown and Heckenlaible outside her house. She asked them what they were "up to," and Heckenlaible replied that they were "going out robbing." Carol mentioned that there was a burglary in Volin, and continued: "If you guys were involved in that, you're going to, you know, get caught, it is under investigation." Brown then stated: "We won't get caught because the best don't get caught."

That same day, Sheriff David Hunhoff and Deputy Sheriff James Vlahakis received a tip from Louise Slemp, a co-worker of the mother of either Heckenlaible or Carol Martin (the record unclear on this

point), to the effect that Heckenlaible and Brown were involved in the Volin burglary. They proceeded to the pair's apartment. Brown answered the door. When the officers asked to speak to Heckenlaible, Brown informed them that he had gone shopping. The officers began to leave and asked another resident, outside, if he had seen Heckenlaible. The resident replied that Heckenlaible had returned home with shopping bags a few minutes before. They then went back to the apartment, to be greeted by Brown's shout: "What the [expletive deleted] do you want?" Heckenlaible then appeared, and consented to the officers' request to look in his car. Brown responded to this belligerently, shouting to Heckenlaible that he should refuse. The officers, after looking at the car briefly, went to the Public Safety Center, voluntarily accompanied by Heckenlaible.

After receiving *Miranda* warnings, Heckenlaible related to the officers that he had driven Brown to Volin on the night in question, and played lookout while Brown burglarized the bar. Heckenlaible signed a similar statement for Deputy Sheriff Vlahakis the next morning, and he and Brown were charged with third-degree burglary. The signed statement related that he and Brown discussed the matter between themselves in jail and decided to fabricate a story to the effect that Brown was not involved, because Brown would go to prison if he were convicted, due to his bad record. At Brown's preliminary hearing on June 29, 1987, under oath, Heckenlaible changed his story: He dropped Brown off by "the river," drove to Volin by himself, burglarized the bar alone, and did not see Brown again until he returned to his apartment before they went to breakfast.

On July 11, Randall Flynn, a jailer, conversed with Heckenlaible and was told that he was afraid that he would go to jail for something he did not do. Heckenlaible also informed Flynn of his fear that Brown's family would kill him if Brown went to jail because of him. Heckenlaible recanted his prior testimony at Brown's second preliminary hearing on August 24, 1987, after being offered "use immunity" under SDCL 23A–14–29. He returned to his first story, in which he drove and functioned as lookout for Brown during the burglary.

Under oath, during trial, Heckenlaible reverted to his testimony at Brown's first preliminary hearing: Brown was not involved. The State, apparently unaware that Heckenlaible had switched stories until he testified that day, impeached him with his earlier sworn testimony from the second preliminary hearing, his written statement to Vlahakis, and his conversation with the jailer, Flynn. Defense counsel, in chambers, agreed with the prosecutor that Heckenlaible's testimonial tack was a surprise. During trial, the prosecutor asked the trial court for, and received, a declaration that Heckenlaible was a hostile witness.

Aside from impeachment by his own prior statements, Heckenlaible's trial testimony was inconsistent with that of other witnesses. Heckenlaible's description of the burgled bar conflicted with that of the owner regarding placement and number of lights inside, the location of the cash register, arrangement of money within the register, and description of the back door. Although Heckenlaible testified that no steps led up to the back door, the owner testified that steep concrete steps were below it. We note that the steps appear in photographs introduced as evidence. Also, the testimony of Angie and Carol regarding the money-borrowing incidents contradicted Heckenlaible. Brown did not testify in his own defense. The jury obviously disbelieved Heckenlaible's trial testimony.

## DECISION

### I. IMPEACHMENT

■ Brown first argues that introduction of Heckenlaible's statements to Deputy Sheriff Vlahakis and Flynn, the jailer, constituted a subterfuge to get inadmissible hearsay before the jury, notwithstanding SDCL 19–14–8, which allows a party to impeach his own witness. His argument, as briefed, is internally conflicting. We are urged to accept that admission of Vlahakis' and Flynn's testimony was unfairly prejudicial to Brown's defense because it

was cumulative (Heckenlaible had already been impeached by his sworn testimony at Brown's preliminary hearing) and because Brown, without this testimony, still had a chance to convince the jury that Heckenlaible was telling the truth at trial. If evidence is merely cumulative, as Brown argues, admission, even if improper, is harmless error. *State v. Miller*, 429 N.W.2d 26 (S.D.1988). If, as he argues, Heckenlaible's trial testimony might have been believed without it, the evidence was relevant.

The core of Brown's position is that these prior inconsistent statements were impermissible under the four-point test of *United States v. Rogers*, 549 F.2d 490 (8th Cir.1976), adopted by this Court in *State v. Gage*, 302 N.W.2d 793, 798 (S.D.1981), which must be satisfied before such statements can be used for impeachment at trial:

1) *Inconsistency:* The statements must be inconsistent.

2) *Relevancy:* The inconsistency must "relate to a matter of sufficient relevancy that the prosecution's case will be adversely affected if the inconsistent testimony is allowed to stand."

3) *Compliance with Rule 613 (SDCL §§ 19-14-24 and 19-14-25):* The prior statement must, on request, be shown or disclosed to opposing counsel, and "if extrinsic evidence is to be used to prove the prior statement, the witness must be afforded an opportunity to explain or deny it, and the opposing party must have an opportunity to interrogate the witness about it."

4) *Limiting instructions:* The trial court "must adequately instruct the jury about the limited purpose for which the prior inconsistent statement is admitted."

*See State v. Ashker*, 412 N.W.2d 97, 100 n. 1 (S.D.1987) (quoting *Rogers*, 549 F.2d at 495–97). Brown argues that the second leg of *Rogers*, relevancy, was not met. As indicated above, this contradicted Brown's assertion that, without such impeachment, Heckenlaible's testimony was believable. Aside from totally undercutting the State's

case, Heckenlaible's trial testimony indicated that he had been subjected to police threats, but no coercion from Brown or his family. Vlahakis contradicted the former, and Flynn contradicted the latter. We deem this testimony relevant.

As noted in *Ashker*, 412 N.W.2d at 102, the *Rogers* test has been supplemented by an additional test: The *Morlang* prohibition on impeachment of one's own witness as a subterfuge to get otherwise inadmissible evidence before the jury (see *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975). The impeachment here passes the *Morlang* test, which allows impeachment to relieve a party of " 'the harshness of subjecting a party to the mercy of a witness who is recalcitrant or may have been unscrupulously tampered with.' " *See Ashker*, 412 N.W.2d at 101 (quoting *United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir.1980) (citation omitted)).

A second additional test was recommended in *Ashker:* The *Weaver* rule, by which a witness cannot be impeached by his prior inconsistent statements unless his testimony has damaged, rather than failed to support, the position of the impeaching party (see *People v. Weaver*, 92 Ill.2d 545, 65 Ill.Dec. 944, 442 N.E.2d 255 (1982)). Under *Weaver*, Heckenlaible's impeachment can be deemed proper, as his testimony was not Brown's sole link to the Volin burglary. Brown's own statement that they would not be caught implicated him in the burglary, as it was in response to Carol's statement concerning that crime. Brown's sudden influx of cash and his continuous presence with Heckenlaible also connected him to the burglary. Here, unlike the situation in *Ashker*, the State was surprised, and qualified Heckenlaible as a hostile witness after his testimony became unfavorable to the prosecution. Thus, under *Weaver*, Heckenlaible's trial testimony was more damaging than his silence would have been, and he was impeachable. *See Ashker*, 412 N.W.2d at 102 n. 3. *See also People v. Amato*, 128 Ill.App.3d 985, 986–87, 84 Ill.Dec. 162, 164, 471 N.E.2d 928, 930 (1984).

In summary, the impeachment of Heckenlaible was proper.

## II. HECKENLAIBLE'S STATEMENT TO CAROL MARTIN THAT THEY WERE "GOING OUT ROBBING" WAS ADMISSIBLE

On June 17, 1987, Heckenlaible responded to Carol Martin's inquiry about their intentions by saying that they were "going out robbing." This led to Carol's warning that they would be caught for the Volin burglary if they were involved, and Brown's retort that they would not be caught because they were "the best."

Heckenlaible's statement was admissible under SDCL 19-16-3(2), which directs that a statement is not hearsay if it is offered against a party and he has manifested his adoption or belief in its truth. Brown did not disavow Heckenlaible's statement (which was made in his presence), and his contribution to the three-way conversation strongly indicates his concurrence.

The State's secondary argument, that the statement was admissible to show plan, intent or state of mind under SDCL 19-16-7, is, arguably, correct as it actually merges into the argument concerning SDCL 19-16-3(2) above. Heckenlaible made the statement, but Brown adopted it as his own through his conduct and subsequent statement about not getting caught. Brown's state of mind at that point is relevant to the jury's understanding of Brown's reply to Carol's remark concerning the Volin burglary. Thus, Heckenlaible's words are admissible.

## III. SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION

In determining the sufficiency of evidence on appeal, the question is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Sitting Crow*, 428 N.W.2d 268, 270 (S.D.1988). In making that determination, this Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. *Id.* Brown argues that there

was no substantive evidence connecting him to the burglary in Volin and the circumstantial evidence assembled by the State did not establish his guilt beyond a reasonable doubt. We disagree.

Regarding convictions which are founded on circumstantial evidence alone, this Court has written that such convictions are warranted where facts and circumstances are shown as are consistent with each other and with guilt of the party charged, such as cannot by any reasonable theory be true and the party charged be innocent. *State v. Ashker*, 412 N.W.2d 97, 105 (S.D.1987). It is not necessary to exclude every possible hypothesis of innocence to uphold a conviction based on circumstantial evidence. *Ashker*, 412 N.W.2d at 105.

Here, even discounting Heckenlaible's testimony, Brown connected himself to the Volin robbery by his statement to Carol Martin that they would not be caught for the burglary in Volin. He did not say that they were not involved in that crime, but stated that they would not be caught because they were "the best." This statement, combined with Brown's apparently continuous presence with Heckenlaible throughout the night in question, as related by other witnesses, their sudden acquisition of money during the time the robbery occurred, the match between the amount stolen ($175 to $200) and the funds they expended on June 15, 1987 (at least $152.34 is accounted for), and their lack of funds as late as 3 a.m. on June 15, point to guilt. Brown's belligerent reaction to Heckenlaible's consent to a search of his car, containing a hammer and tire iron possibly used in the burglary, also supports an inference of implication in burglary. The major evidentiary gap that Brown hangs his argument on is the lack of evidence, placing him in the bar at Volin. Brown's statement to Carol fills that void.

In his argument regarding impeachment, Brown suggested that Heckenlaible's testimony, if believed, might have offset the State's other evidence. Heckenlaible's trial testimony, concerning the actual burglary, established that he was familiar with the items taken, *i.e.*, $177 in cash, plus five

packs of Marlboro cigarettes. Interestingly, we note he testified that Brown, not he, smoked Marlboros, and that Winston, his brand, were on the rack but were not taken. Heckenlaible also demonstrated a pronounced lack of knowledge of the bar's layout, the capstone of which was his insistence that there were no steps at the back door. Heckenlaible's trial testimony could not absolve Brown by overcoming the State's circumstantial evidence. The State may prove all elements, including intent, with circumstantial evidence. *State v. Cody*, 323 N.W.2d 863, 869 (S.D.1982). The jury heard all of the evidence, direct and circumstantial, and determined Brown was guilty.

## IV. BROWN'S SENTENCE WAS NOT CRUEL AND UNUSUAL PUNISHMENT

■ Brown was convicted of a Class 4 felony, which authorizes imprisonment of ten years. We do not believe that the seven and one-half year sentence shocks the conscience under our holding in *State v. Weiker*, 366 N.W.2d 823 (S.D.1985). Under the Eighth Amendment, we review sentences to determine whether they are unconstitutionally disproportionate. *See State v. Myers*, 411 N.W.2d 402, 403 (S.D. 1987).

Brown compiled six juvenile offenses of third-degree burglary. He was antagonistic to law enforcement officers. A court services officer reported that he was not supervisable. He had a history of "gas jumping" and petty theft charges in the City of Yankton. He appeared to be rebellious to all types of civilized authority. We understand why the trial judge sentenced Brown to seven and one-half years imprisonment. His sentence is neither cruel nor unusual. Considering the three objective criteria in *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637, 650 (1983), we are of the opinion that Brown has not demonstrated that his sentence is disproportionate.

AFFIRMED.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., concurs specially.

SABERS, Justice (specially concurring).

I write specially to point out the necessity of separating and keeping separate the numerous versions of testimony in relation to "Witness" Heckenlaible, as follows:

1. Heckenlaible's written statement to Deputy Vlahakis implicated Brown as the burglar.
2. Heckenlaible's sworn testimony from Brown's first preliminary hearing which attempted to exonerate Brown as not involved in the burglary.
3. Heckenlaible's conversation with Jailer Flynn stated that Brown was the burglar and that Brown pressured him to lie to protect Brown.
4. Heckenlaible's sworn testimony from Brown's second preliminary hearing which implicated Brown as the burglar.

It is important to note that the sworn testimony at 2. and 4. was not hearsay. It was direct, substantive, eye witness testimony of Heckenlaible's own actions and observations.

With this background it is important to note that at trial, Heckenlaible reverted to his testimony from Brown's first preliminary hearing to the effect that Brown was not involved. The State was surprised and the prosecutor asked the trial court for, and received, a ruling that Heckenlaible was a hostile witness. Heckenlaible's sworn testimony from Brown's second preliminary hearing was admissible as it was not hearsay. It was direct, substantive, eye witness testimony. Therefore, this sworn testimony was not subject to the rules concerning impeachment of State's own witness or the cases relating thereto, such as *State v. Ashker*, 412 N.W.2d 97 (S.D.1987); *State v. Rufener*, 401 N.W.2d 740 (S.D.1987); and *State v. Gage*, 302 N.W.2d 793 (S.D.1981).

The written statement set forth in 1. and the conversation in 3. are referred to in the facts of the majority opinion but are not

specifically addressed in the discussion. Since Heckenlaible was on the witness stand at the trial, claiming a version which damaged the State's position, as opposed to simply not supporting it, both 1. and 3. are proper impeachment of Heckenlaible even under the *Weaver* test. As set forth in footnote 3 in *Ashker, supra* at 102:

> A ... witness, ... cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful.

*People v. Weaver*, 92 Ill.2d 545, 563–64, 65 Ill.Dec. 944, 951, 442 N.E.2d 255, 262–63 (1982) (*citing People v. Johnson*, 333 Ill. 469, 165 N.E. 235 (1929); *People v. Chitwood*, 36 Ill.App.3d 1017, 344 N.E.2d 611 (1976); McCormick, *Evidence* § 36 (2d ed. 1972)). Therefore, they are proper impeachment even though they both constitute hearsay.