THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HENRY KACZMAREK, Defendant-Appellant.

First District (3rd Division)   No. 1—89—3182

Opinion filed March 31, 1993.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, and Dennis M. Cooley, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Howard D. Weisman, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Henry Kaczmarek, was convicted of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1), residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3), home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11), and armed robbery (Ill. Rev. Stat. 1987, ch. 38, pars. 18—1, 18—2). He was sentenced to natural life in prison for the murder conviction. On appeal, defendant asserts that (1) he was not proven guilty beyond a reasonable doubt because no physical evidence was found in the apartment to link him to the crime; (2) he was not proven guilty of armed robbery beyond a reasonable doubt; (3) he was not proven guilty of home invasion or residential burglary beyond a reasonable doubt; (4) the trial court erred in denying defendant the opportunity to offer evidence that someone other than himself committed the offense; (5) the trial court erred in precluding defendant from introducing the remainder of his statement after the State introduced part of that statement; (6) he is entitled to

a new trial because the State improperly argued that Ms. Nielson's blood matched the bloodstains found on his jacket and pants and impermissibly argued that the percentage of people having Ms. Nielson's blood type was less than 1%; (7) his due process right to a fair trial was denied by restricting his ability to impeach Ron Larry regarding his pending contempt charge; and (8) he is entitled to a new trial because the trial court refused to instruct the jury on the affirmative defense of voluntary intoxication. We reverse and remand.

Millie Nielson, who was 86 years old, lived on the first floor of a two-flat building at 3507 W. Diversey Avenue, Chicago. Dan Larry, his wife, Margaret Larry (now ex-wife), and Margaret's 19-year-old son, John Fisher, lived on the second floor. On April 25, 1987, Ms. Nielson's body was found beaten, strangled, and stabbed in her home.

Margaret testified that she saw Ms. Nielson on April 24, 1987, around 4:40 p.m. At 6:15 p.m., Margaret and John went bowling, returning home about 10:40 p.m. Her ex-husband, Dan, was passed out on the couch from drinking. Defendant, who had been living with the Larrys for a month, was in the apartment, drinking beer and watching television. Margaret noticed that defendant was wearing light-colored jeans and a dark, quilted jacket, but did not notice any stains on his clothes. Before Margaret went to bed at 11 p.m., defendant helped her put Dan to bed.

Margaret further testified that she was awakened at midnight by Dan's brother, Ron Larry, who was ringing the doorbell. When he asked if Dan was there, Margaret told him "no," because she did not want him in her home.

Around 2 a.m., defendant rang the front doorbell and asked if Dan was awake. After Margaret told defendant that he was asleep and she would not wake him, she locked the door and went back to bed. Margaret stated that defendant was not slurring his words, staggering, or swaying. She did not have trouble understanding him even though she did have trouble understanding him when he was drunk.

When Margaret awoke at 7:15 a.m. on April 25, 1987, defendant was sleeping on the living room couch. He was wearing a short-sleeved yellow dress shirt and clean, dark jeans. Defendant awoke at 8 a.m. Although he did not stumble or sway, he looked nervous as he walked around the coffee table two or three times. Margaret stated that defendant always looked nervous after a night of drinking. Margaret left the house around 9 a.m.

On cross-examination, Margaret testified that she told the police on April 25, 1987, that no one had left the house the previous eve-

ning. She also did not tell the police that defendant was wearing different clothes on Saturday morning.

John Fisher testified that he and defendant watched television until John went to bed about 11:30 p.m. or 12 a.m. on April 24, 1987. At that time, defendant was wearing his usual attire, which was light-colored blue jeans, a flannel shirt, and a blue quilted jacket. John did not notice any stains on defendant's clothes. Defendant left the apartment, returned about 30 minutes later, and asked if Dan was awake. When John replied "no," defendant told him that he was going back out to find his car. John stated that he had no trouble understanding defendant even though he had trouble understanding him when he was drunk. John further testified that defendant did not stagger, sway, or have any problems walking.

John stated that he awoke at 10 a.m. on April 25, 1987, when the police came to question him. Initially, he told the police that no one had left the house the previous evening. Around noon, after speaking with numerous police officers, John told them that defendant had left the house. John said that it was not unusual for defendant to go out and return late at night. John stated that he was a heavy sleeper and did not hear the doorbell during the night.

Ronald Sadlowski, Ms. Nielson's maintenance helper, testified that, at 9:45 a.m. on April 25, 1987, he noticed that Ms. Nielson's back pantry window was broken and the back storm door was open. He called the police.

When Chicago police officer Ross Marsala responded to the call, he found Ms. Nielson's body lying face up on a bed in the rear bedroom. Marsala testified that bloodstains were on the floor and a bloodstained knife was on a small kitchen table. In the second bedroom, the dresser drawers were open, papers were scattered on the floor, and the bed's dust ruffle was bloodstained. In the front of the apartment, there was a small cabinet with open doors. Officer Marsala did not notice any signs of forced entry. The front door was locked with the keys still in the lock.

Dennis Veneigh, a Chicago police crime lab officer, testified that he dusted for fingerprints, but found none suitable for lifting. On the broken pieces of glass near the back door, Veneigh found fabric impressions, indicating that a cloth or gloves had been used. He also found fabric impressions on the door frame outside the rear bedroom.

Chicago police detective Jerome Bogucki testified that Ron Larry told him that he went to Dan's apartment around 1 a.m. to sleep on the second-floor back porch from where he saw defendant in the back-yard carrying a bag. Around 1 a.m. on April 26, 1987, Detective Bo-

gucki and his partner went with Ron to find defendant. When they found defendant sleeping in his car, the detectives approached the car, shined their flashlights, knocked on the window, identified themselves as police officers, and asked defendant to step out of the car. Bogucki noticed two small bloodstains on the sleeves of defendant's quilted jacket. Defendant was also wearing blue jeans and a plaid shirt. Bogucki did not notice any bloodstains on defendant's shirt, pants, or shoes. The detectives placed defendant under arrest, advised him of his *Miranda* rights, and took him to the police station. Bogucki stated that defendant did not appear to be drunk or smell of alcohol.

At the police station, defendant was cooperative and signed written consent forms to give a blood sample and to search his car. While searching the car, detectives found numerous bloodstained jewelry boxes, jewelry, a Marshall Field's bag containing serving plates and dishes, an alarm clock, a clock radio, a purse, a claw hammer, a glass cutter, a screwdriver, pliers, clothing, and jeans with bloodstains on both legs.

Detective Robert Davie, the evidence technician who processed defendant's car, testified that he did not find any gloves or any blood in the trunk and none of the items had fingerprints suitable for comparison. Various evidence technicians testified that there were no fingerprints suitable for comparison found in Ms. Nielson's apartment, on any of her possessions, or on the knife identified as the possible murder weapon. Ms. Nielson's family members viewed the property and identified numerous pieces of Ms. Nielson's jewelry, serving dishes, and alarm clock.

Dr. Michael Chamblis, who performed the autopsy, testified that Ms. Nielson had multiple head and facial injuries, external bruises and abrasions to her jaw and neck resulting from multiple blunt blows, and lacerations and bruises to her arms, left thigh, right forearm, hands, right wrist, and right elbow. There were multiple bruises on Ms. Nielson's right breast, right front shoulder, upper left chest, and right clavicle. She also had internal injuries that indicated manual strangulation, including a fractured and hemorrhaged larynx, a hemorrhaged tongue, and a bite mark on Ms. Nielson's tongue. In addition, the undersurface of Ms. Nielson's scalp, skull, and brain were bruised from multiple blows to the head.

Because it is common for stab wounds to ooze blood after the infliction of the wound, Dr. Chamblis explained, it would not be unusual for the killer to have only a small amount of blood on his clothes despite the fact that Ms. Nielson lost a considerable amount of blood. In Dr. Chamblis' opinion, Ms. Nielson was on her back when stabbed in

the legs. Several of the wounds were defense wounds. Dr. Chamblis concluded that Ms. Nielson died as a result of strangulation with contributing factors of blunt force injuries and multiple stab wounds. Dr. Chamblis also testified that Ms. Nielson could have died from blunt force injuries.

Pamela Fish, a serology expert, testified that she examined blood samples from defendant, Ms. Nielson, defendant's jeans and quilted jacket, and Ms. Nielson's kitchen floor. Fish determined that Ms. Nielson had Type A blood with the EAP-BA enzyme and defendant has Type B blood with EAP-CA enzyme. Their ESD, PGM, ADA, AK, hemoglobin, PEP A, and G-6PD enzymes were the same. The blood on defendant's jeans, defendant's quilted jacket, and Ms. Nielson's kitchen floor all tested positive for Type A blood. In addition, defendant's clothes had the same enzymes as both defendant and Ms. Nielson. There was an insufficient amount of blood on the knife and jewelry boxes from defendant's car trunk to be able to type the blood.

On cross-examination, the defense counsel questioned Fish about the frequency of Type A blood in the general population. Fish testified that 40% of the population had Type A blood. On redirect examination, she stated that 8 in every 1,000 people, or less than 1% of the population, have the ESD 2-1 with Type A blood.

After the State rested its case, the trial court granted the State's motion *in limine* that defense counsel not be allowed to present evidence of similar crimes in his case in chief. Defense counsel argued that he wanted to present evidence of similar crimes against Louis Bergeron and Ruth Agapi that occurred within 1½ blocks of Ms. Nielson's apartment during the 10 days prior to her murder.

Defendant testified that he was a construction worker, had a ninth-grade education, was not married, had a speech problem, and started drinking when he was 10 or 11 years old. In April 1987, he lived with the Larrys for six weeks. He was not working at the time because he had been laid off the previous fall.

According to defendant, he fought with Bob Hendrickson and Tom Szeszol three days before he was arrested. As a result, Bob and Tom were bleeding and defendant's knuckle was cut. Later that same night, defendant found a man trying to break into his car, so he hit him three or four times and then kneed him. As a result of that incident, the man bled.

Defendant testified that he began drinking with Dan in the morning of April 24, 1987. They went to Tom's apartment, where he washed his laundry. Defendant wanted to soak a pair of jeans that had blood on them, but he did not have a chance to do so before Tom

asked him to leave. Defendant testified that he put the bloodstained jeans in his car trunk, drove Dan home, and went to Mike's Tavern until 6:30 p.m. Defendant then went to the Larrys' apartment, where he and Dan drank a case of beer. Defendant denied helping Margaret put Dan to bed that night.

Defendant stated that he left the Larrys' apartment at 11:45 p.m. to go to a tavern, where he had two drinks in 15 minutes. He then went to another tavern, where he had 12 drinks. At 2 a.m., he went back to the Larrys' apartment. Because he had to relieve himself, defendant parked his car in the alley behind the building. While in the alley, he heard a noise and went into the gangway. He saw a garbage bag next to the house, picked it up, and put it into the trunk of his car without looking in it. After relieving himself, defendant drove to the front of the building, parked, and went upstairs to see if Dan was awake.

Even though he had a key to the apartment, defendant rang the doorbell. Margaret told him that Dan was still asleep, so defendant went back to the second tavern. After closing, he gave Liz Finuchi and Dan Funkhauser a ride home. Around 4:30 a.m., he returned to the Larrys' apartment, parked his car across the street, went upstairs, and went to sleep on the living room couch. He did not take off his clothes before going to sleep.

After awaking at 8 a.m., defendant and Dan went to a tavern and then drove to Bill Brown's house so that he could repay a debt. Defendant testified that the first time he looked into the bloodstained garbage bag was at Bill's house. Defendant separated the items, and threw the bag, pillowcase, and worthless items into a dumpster. Bill gave defendant $60 for the silver spoons.

Defendant then drove Dan home and went to a tavern for a few beers. He called Dan, who told him about the murder. Defendant then went to the Larrys', but no one was home, so he went back to the tavern. Later, he fell asleep in his car. He was awakened by the police, who arrested him and took him to the police station, where he was questioned.

Defendant denied breaking into Ms. Nielson's apartment, killing her, or stealing her property. He stated that he saw Ms. Nielson only once, did not know that she lived alone, and did not remember telling the police, "maybe I did it, but I don't remember."

Detective Raymond Schalk testified that he questioned defendant on April 26, 1987, around 2:15 a.m. After telling defendant that Ron saw him walking through the backyard with a bag, that they recov-

ered items from his car trunk, and that his jacket and jeans had blood on them, defendant responded, "maybe I did it. I don't remember."

Assistant State's Attorney Richard Stevens testified that he interviewed defendant at 9 a.m. on April 26, 1987. When Stevens asked defendant if he was in Ms. Nielson's apartment on April 24 or April 25, defendant replied that he could have been there. When Stevens asked him if he had killed Ms. Nielson, defendant responded that he could have, but did not remember.

Ron Larry, who had previous felony convictions, testified that he went to his brother's second-floor back porch around 1 a.m. on April 25, 1987, to sleep after drinking heavily. Ron did not pay attention to Ms. Nielson's back porch, which was on the first floor.

According to Ron, he saw defendant walking through the back yard carrying a garbage bag about 2:30 a.m. Ron did not see defendant on Ms. Nielson's back porch nor did he hear any noise coming from Ms. Nielson's apartment. Ron denied ringing the Larrys' doorbell or speaking to anyone in the Larrys' apartment that night. Ron further testified that he awoke at 7 a.m. and left. He did not notice anything unusual on the first-floor porch at that time.

Because he had a pending contempt charge for not complying with a defense subpoena in this case, Ron was appointed an attorney. When the defense counsel attempted to question whether Ron came to court voluntarily or because he had been arrested for noncompliance with the subpoena, Ron's counsel objected. Because the questioning involved a pending contempt case, the trial court sustained the State's objection.

Tom Szeszol testified that defendant came to his apartment on the afternoon of April 24, 1987. His ex-wife, Julia, was washing defendant's clothes. Tom wanted his friends to leave, so he gave defendant a clean set of clothes, which defendant was wearing when he left. Although Tom admitted getting into a fight with defendant, he stated that the fight was two weeks before defendant's arrest, not three days. Tom testified that his blood type was B positive.

Julia Dillow, Tom's ex-wife, testified that she was doing defendant's laundry on April 24, 1987, while he was playing cards and drinking. She did not finish washing his clothes before he left. She stated that Tom gave defendant one of his flannel shirts and a pair of jeans to wear.

Elizabeth Finuchi testified that she had been drinking for four or five hours when she saw defendant at a tavern after 2 or 2:30 a.m. on April 25, 1987. Defendant bought her a drink and then drove her and

a friend home around 4 a.m. Finuchi stated that she did not notice anything unusual about defendant or his clothes.

Daniel Funkhauser testified that defendant gave him and Finuchi a ride at 4 a.m. on April 25, 1987. Funkhauser stated that he had been drinking for eight hours, did not notice anything unusual about defendant, nor did he notice any blood on defendant's clothing, coat, or hands.

Bill Brown testified that defendant and another man came to his home at 1:30 or 2 p.m. on April 25, 1987. Bill stated that defendant showed him some old coins, costume jewelry, work clothes, and silverware, which were in his car trunk. Bill testified that it was not unusual for defendant to have silverware in his trunk. After Bill gave defendant $20 or $30 for the coins and silverware, the two men left.

Pamela Hines, who previously lived with defendant, testified that defendant used a Marshall Field's bag as luggage when he moved out of her home. She also stated that the two clocks found in defendant's trunk were his and that defendant owned tools, including a glass cutter.

Chicago police officer William Kaupert testified that there was blood on Ms. Nielson's kitchen floor, on the floor next to the rear bedroom, in the front bedroom, on a white box, on the door molding, on a table, and on two walls in the rear bedroom. Kaupert stated that there were glove impressions on the molding, no fingerprints suitable for comparison, and the window had been broken out, not in.

The trial court denied defendant's request for an instruction on the affirmative defense of voluntary intoxication.

During closing arguments, the State remarked:

"[Pamela Fisher] pointed out to you *** that the blood of Millie Nielson matches that of the blood found on Henry Kaczmarek's jacket and Henry Kaczmarek's jeans.

* * *

She also told you that less than one percent of the population has the same blood that matches that found on the defendant's clothes."

In its rebuttal argument, the State commented:

"[I]f you look at every other enzyme [other than GLO 1, where there was no reaction] and compare it with Millie Nielson's known blood standard, they all match up. They are all identical, and the reason they are identical is because when Millie Nielson was fighting this defendant, she was dropping blood on his clothes. That's why they are identical.

Millie Nielson has supplied us with the evidence to convict the defendant. Her blood is on his clothes."

Following closing arguments, the jury found defendant guilty of murder, residential burglary, home invasion, and armed robbery. After denying defendant's motion for a new trial, the trial court sentenced him for murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) to natural life imprisonment without parole based on the brutal and heinous nature of the offense and on felony murder.

Defendant asserts that he was not proven guilty beyond a reasonable doubt since no physical evidence was found in the apartment to link him with the offense. Neither his fingerprints nor blood was found in Ms. Nielson's apartment, and no blood was found on his boots. Defendant maintains that the amount of blood in Ms. Nielson's apartment would indicate that the offender had a significant amount of blood on his clothes and on the bottom of his shoes. Instead, defendant argues, the two small bloodstains on his jacket were consistent with merely carrying the bloody garbage bag to the car and the bloodstains on his jeans were consistent with them being in the car trunk next to the bloody garbage bag. Furthermore, defendant contends, Ron's testimony is consistent with his explanation that he found the garbage bag in the backyard. Ron testified that he saw defendant carrying a garbage bag with his arms extended in front of him. Defendant states that he threw out the bloodstained garbage bag on the way to Bill's house the next day. The police did not find the garbage bag.

Moreover, defendant argues, Ron never saw him go inside the apartment, come out of the apartment, on the porch, or any closer than 10 feet from the building. Defendant's theory of defense was that someone else, probably Ron, was the offender. Defendant states that Ron's testimony was inconsistent and he had the opportunity to commit the crime. In light of his testimony regarding how he found and carried the bag of items, getting bloodstains on his clothing, defendant concludes that the State's circumstantial evidence was insufficient to prove him guilty beyond a reasonable doubt.

When a conviction is based on circumstantial evidence, it will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) No longer is the State required to exclude every reasonable hypothesis of innocence. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291; *People v. Eyler* (1989), 133 Ill. 2d 173, 191.) Circumstantial evidence is the proof of facts or circumstances

that give rise to a reasonable inference of other facts that tend to establish the guilt or innocence of the defendant. *People v. Evans* (1981), 87 Ill. 2d 77, 83.

■ Although another jury could have analyzed the evidence differently, this jury could reasonably infer from all the evidence that defendant was guilty of murder even without physical evidence in the apartment that linked him to the offense. Defendant had the opportunity to kill Ms. Nielson. He was seen near her apartment carrying a garbage bag containing some of her property. Blood that is consistent with Ms. Nielson's blood was on defendant's jacket and jeans. Some of Ms. Nielson's property was found in defendant's car trunk. The evidence is not so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. Therefore, we affirm defendant's murder conviction.

Next, defendant asserts that the trial court erred in denying him the opportunity to offer evidence of similar crimes committed in close physical and temporal proximity to this offense and that those victims were prepared to testify that defendant was not the offender in those crimes.

During the cross-examination of Officer Bogucki, defendant was precluded from introducing evidence that two people severely beat and robbed Louis Bergeron, who was 86 years old, on April 16, 1987. Then, prior to defendant's case, the trial court sustained the State's motion *in limine*, precluding defendant from introducing any evidence of crimes against Louis Bergeron or Ruth Agapi.

Defense counsel stated that he intended to call both persons in his case in chief. Bergeron would testify that he lived 1½ blocks from Ms. Nielson's apartment; he was robbed and beaten at his home on April 16, 1987; and the two offenders were wearing gloves. After giving a description of the two people, Bergeron would testify that defendant was not one of the offenders.

Agapi, who lived almost directly across the street from Ms. Nielson, would testify that approximately one week before Ms. Nielson's murder, she heard noises on her back porch. After continuing to hear noises, she saw a gloved man standing on her previously locked porch. Agapi did not open the door and the man left. Agapi would have testified that defendant was not the man she confronted.

Defendant argues that those two offenses had many similarities to this offense. They were close in time and they both occurred on Diversey Avenue within 1½ blocks of Ms. Nielson's apartment. The offenders in the Bergeron and Agapi incidents wore gloves as did the offender in this case. Bergeron was an elderly person beaten and left

for dead. In the Agapi case, the offender got in a locked door without signs of forced entry. Defendant concludes that he must be given a new trial because the jury was precluded from hearing this relevant exculpatory evidence.

Defendant relies on *People v. Watson* (1966), 36 Ill. 2d 228, which is factually distinguishable. That defendant, who was charged with attempted forgery by delivery of a forged check, was precluded from introducing evidence that a similar check was forged and cashed after he had been taken into custody. (*Watson*, 36 Ill. 2d at 231.) The reviewing court ruled that the jury should have been allowed to infer that the defendant did not sign or attempt to deliver either check, thereby exonerating him from the offense charged. *Watson*, 36 Ill. 2d at 231.

Defendant then cites cases that involve the admission of other crimes evidence against a defendant. See *People v. Richardson* (1988), 123 Ill. 2d 322; *People v. Nitti* (1924), 312 Ill. 73; *People v. Lewis* (1983), 115 Ill. App. 3d 389.

A defendant must be allowed to offer competent evidence that he was not the perpetrator of the offense. (*Watson*, 36 Ill. 2d at 232.) To do that, the defendant may present evidence that is not too speculative or too remote in time. (*People v. Morgan* (1991), 142 Ill. 2d 410, 441.) The trial court has broad discretion in ruling on evidentiary issues and will not be reversed absent an abuse of discretion. *People v. Bruce* (1989), 185 Ill. App. 3d 356, 365.

■ The trial court did not abuse its discretion in barring the evidence of the other two offenses. They were not similar enough to this crime to be relevant. Even though they were close in time and proximity, the types of offenses were different. Not only were they different from this offense, but they were different from each other. Bergeron was a male, who was not killed or stabbed, and no windows were broken. Agapi was not even attacked. Moreover, there is no evidence that suggests that the same person was involved in the Bergeron and Agapi offenses.

Next, defendant asserts that the trial court erred in precluding him from introducing the remainder of his custodial statement after the State introduced part of that statement. By relating only defendant's statement that he may have committed the offense, but did not remember, defendant argues that the State falsely insinuated that he never previously told the police about finding the garbage bag in the backyard. Defendant maintains that the entire statement was necessary to give the jury adequate information to determine the weight of

the statement, if any; to rebut the State's theory; and to make sure that the jury was not misled.

On cross-examination, the State asked defendant whether he told the police when he was arrested, "maybe I did it, but I don't remember." Defendant replied that he did not recall saying that to the police.

During the State's rebuttal case, Officer Raymond Schalk testified that on April 26, 1987, defendant denied committing the offense, but later told him, "maybe I did it, I don't remember." On cross-examination, defense counsel asked if defendant told him more. The court sustained the State's objection.

Assistant State's Attorney Stevens testified that defendant told him that he could have killed Millie Nielson but he did not remember. In its closing argument, the State repeatedly commented that defendant admitted he could have killed Ms. Nielson but did not remember.

Defendant argues that the State misled the jury into thinking that "today" at trial two years after he was arrested, he invented the story that he found the bag, two years after he was arrested. In questioning defendant during the trial, the State repeatedly asked, "[t]oday you remember pick[ing] up the bag," "[t]oday you remember put[ting] it in the trunk." Later, the State argued in closing argument "[a]lthough the defendant told detectives one day after the murder that he didn't remember, today he remembers, two years later he remembers."

Defendant relies on *People v. Weaver* (1982), 92 Ill. 2d 545, 556, where the court ruled that the failure to allow the defendant to bring forth his entire statement was prejudicial because further details about the conversation could have affected the jury's belief about the defendant's truthfulness during the conversation. The State was allowed to introduce selected, unrecorded verbal statements made by the defendant, including a statement that there were two men with guns in her house and that she ran from the house in a panic. In that case defense counsel was precluded from bringing out the entire content of the statement, including what else defendant had said about the two men. (*Weaver*, 92 Ill. 2d at 556-57.) Without the entire conversation, the jury could have been misled into thinking that the defendant said nothing more. *Weaver*, 92 Ill. 2d at 556-57.

Defendant also cites *People v. Klinkhammer* (1982), 105 Ill. App. 3d 747, 749, where the court held that a jury should be entitled to hear defendant's entire statement in order to determine the amount of credence it should give any inconsistency. A State witness had made a tape-recorded statement to police implicating himself and the

defendant. (*Klinkhammer*, 105 Ill. App. 3d at 748.) At trial, during cross-examination, the defendant used portions of the taped statement to impeach the witness by exposing contradictions in his testimony. (*Klinkhammer*, 105 Ill. App. 3d at 749.) During redirect examination, the trial court allowed the State to introduce the entire statement into evidence. (*Klinkhammer*, 105 Ill. App. 3d at 748.) The reviewing court ruled that the trial court properly allowed the State to introduce the full statement. *Klinkhammer*, 105 Ill. App. 3d at 749.

In addition, defendant cites *People v. Hartness* (1977), 45 Ill. App. 3d 129, 141, where the appellate court held that the trial court erred in limiting the defendant's further examination of the witness since the unexplained testimony could be susceptible to misconstruction.

The State responds that defendant's entire statement was introduced when he testified at trial; that the defense counsel's attempt to re-cross-examine Detective Schalk on rebuttal was improper because it was out of the scope of the redirect examination; and that the defense counsel failed to ask the proper questions on cross-examination. Consequently, the State concludes that the trial court did not abuse its discretion in limiting the re-cross-examination to the scope of the redirect examination.

It is well established that if one party introduces part of an utterance or writing, the opposing party may introduce the remainder or as much as is required to place that part originally offered in proper context so that a correct and true meaning is conveyed to the jury. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 556.) Once a conversation is related by a witness, the opposing party has the right to bring out all of the conversation on cross-examination. (*Weaver*, 92 Ill. 2d at 556.) Furthermore, if a witness has been impeached by proof that he has made prior inconsistent statements, he may bring out all of the prior statements to qualify or explain the inconsistency and rehabilitate the witness. *People v. Harris* (1988), 123 Ill. 2d 113, 142.

■ The trial court erred by not allowing defendant to present his entire statement. Without hearing defendant's entire statement, the jury could have been misled into thinking that the first time defendant stated that he found the garbage bag in the backyard was at trial instead of at the time he was arrested. Furthermore, the prosecutor's urging the jury to consider his statement substantively made it all the more important that the full context of his statement be given. Since the jury's assessment of his credibility was crucial, the error was prejudicial. Although the evidence linking defendant to the murder was sufficient for the jury to find him guilty beyond a reasonable doubt, there was not such overwhelming evidence of guilt so as to find the

error harmless. (*People v. Enis* (1990), 139 Ill. 2d 264, 298.) Consequently, we reverse defendant's murder conviction and remand this cause for a new trial.

■ Next, defendant asserts that he is entitled to a new trial because the State improperly argued that Ms. Nielson's blood matched the bloodstains found on his clothes and impermissibly argued that the percentage of people having Ms. Nielson's blood type was less than 1%. Defendant waived the issue because he did not object to the prosecutor's closing argument.

Defendant then asserts that his sixth amendment and due process rights to a fair trial were denied by restricting his ability to impeach Ron Larry regarding his pending contempt charge. Defendant argues that it was critical to show that Ron had a motive to lie because (1) defendant's theory was that Ron implicated defendant to the police because Ron was the offender and (2) Ron had a pending contempt charge for failing to appear at the trial pursuant to a defense subpoena. When defendant attempted to question Ron about the circumstances of the contempt charge, the trial court sustained the State's objection.

The State responds that the trial court properly precluded defendant from questioning Ron about his pending contempt charge because the charge had no significance to Ron's motive, bias or interest to lie. Furthermore, the State explains, the trial court prohibited any questions about Ron's pending charge so that he would not be forced to incriminate himself.

A defendant may question a witness on any matter where it would reasonably tend to indicate that his testimony might be influenced by an interest, bias, or motive to testify falsely. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475.) That evidence must not be remote or uncertain, but must give rise to the inference that the witness has something to gain or lose by his testimony. (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 1015.) The accused has the right to question a witness concerning any matter that explains, modifies, or discredits what he said on direct examination. *People v. Barr* (1972), 51 Ill. 2d 50, 51.

■ The trial court did not err by prohibiting the defense counsel from inquiring into Ron's pending contempt charge. Ron's testimony at trial was essentially the same as his initial statement to the police the day after Ms. Nielson's murder. Since the contempt charge did not arise until after the trial began, it was irrelevant to any motive, bias or interest to lie. The trial court properly barred that question so that Ron would not be forced to incriminate himself.

Next, defendant asserts that he is entitled to a new trial because the trial court refused to instruct the jury on the affirmative defense of voluntary intoxication. We disagree.

Under Illinois law, a person in an intoxicated condition is criminally responsible for his conduct unless the condition is so extreme that it suspends his power of reason and renders him incapable of forming a specific intent that is an element of the offense. (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 555; Ill. Rev. Stat. 1987, ch. 38, par. 6—4(a).) Merely being intoxicated is insufficient to create a defense. *People v. Feagans* (1983), 118 Ill. App. 3d 991, 997.

██ There was no evidence presented that defendant was intoxicated and not in control of his actions. Instead, there was significant testimony that defendant was not intoxicated the night Ms. Nielson was killed. Thus, the trial court did not abuse its discretion by refusing to tender the voluntary intoxication defense instruction.

██ The defendant asserts that he was not proven guilty of residential burglary, home invasion and armed robbery beyond a reasonable doubt. Although guilty verdicts were returned against defendant for the offenses of residential burglary, home invasion, and armed robbery, no sentence was imposed on those verdicts. The final judgment in a criminal case is the sentence, and in the absence of the imposition of a sentence, an appeal cannot be entertained. (*People v. Caballero* (1984), 102 Ill. 2d 23, 51.) The notice of appeal in the record only appeals from the murder conviction and sentence.

For this reason, the residential burglary, home invasion, and armed robbery convictions are not before this court. The appeals for these convictions are therefore dismissed.

Based on the foregoing, the murder conviction is reversed and remanded for a new trial.

Reversed and remanded.

TULLY, P.J., and GREIMAN, J., concur.