*In re* T.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. T.S., Respondent-Appellant).

First District (4th Division)   No. 1—96—2205

Opinion filed April 24, 1997.—Rehearing denied May 21, 1997.

Rita A. Fry, Public Defender, of Chicago (Todd Avery Shanker, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Kevin T. Kent, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a bench trial, respondent, T.S., was found guilty of robbery (720 ILCS 5/18—1 (West 1994)), adjudicated a delinquent, and committed to the Juvenile Department of Corrections. On appeal, respondent asserts that (1) he was denied a fair trial because the trial court explicitly based its guilty finding on nonexistent evidence; (2) he was denied a fair trial because the trial court improperly used impeachment testimony as substantive evidence in its finding; and (3) his right to confrontation was violated because he was not allowed to

cross-examine the victim for possible bias. For the following reasons, we affirm.

Prior to trial, the trial court denied respondent's motion *in limine* to cross-examine the victim, Willie Newsom, about three felony charges that had been stricken with leave to reinstate, which were still within the statute of limitations.

At trial, Newsom testified that he and Will Clarke were walking on Rockwell Street near 71st Street in Chicago on January 20, 1996, around 8:30 p.m. The area was well lit with streetlights. They encountered T.S. and another teenager, who asked them several questions. Newsom recognized T.S. from playing basketball at Marquette Park and identified him in court.

Newsom and Clarke continued to walk south on Rockwell as T.S. and the other teenager shouted at them. When Newsom and Clarke turned west on 72nd Street, T.S. and the other teenager started to run toward them. According to Newsom, T.S. was wearing a green and black flannel shirt and dark-colored pants, and the other teenager was wearing a black and blue coat.

With the two offenders chasing them, Newsom ran down one alley as Clarke ran toward a different alley. Newsom hid in someone's back yard but could hear voices threatening him from the alley. He ran from yard to yard until he ran westbound through an alley near California Street. There, he saw the second teenager, who was carrying a brick, coming from the side of a Clark service station. When Newsom started to run away, the offender threw the brick, hitting Newsom in the back of his head. After Newsom stumbled and fell, the second offender jumped on him and started to beat him.

At that point, Newsom saw T.S. run into the alley. As the second offender continued hitting Newsom in the head, T.S. went through Newsom's pockets and took his wallet, social security card, check stubs, and $30 in cash. He also took Newsom's suede coat and a pager.

When a car drove up, the two offenders ran. The woman in the car drove Newsom to a gas station where she called an ambulance and the police. An ambulance arrived and took him to a hospital where he told the police that he had been robbed and that the name of one of the offenders was Tywon, which is T.S.'s first name.

On February 2, 1996, at the police station, Newsom looked into a room where T.S. was sitting by himself and nodded to the police, "He's the one." Newsom denied that he also positively identified Derrick Thornton as the second offender.

Will Clarke testified that he and Newsom were walking on 72nd Street near Talman Avenue on the night of January 22, 1996, when Newsom stopped to talk with a group of people. Clarke continued to

walk and Newsom caught up to him. When the group of people looked as if they were running toward them, Newsom told Clarke to run. Clarke and Newsom began to run, splitting up along the way. Clarke did not see Newsom again that evening.

Judith Leavell testified that she was at the Clark gasoline station at the corner of 71st Street and California Avenue about 8 p.m. on January 22, 1996, getting gas for her car. She noticed a young man, whom she identified as Newsom, walking southbound on California Avenue and another young man, whom she identified as T.S., "skulking" around the corner of the gas station. She stared at T.S. because he appeared to have something in his right hand behind his back and she was afraid it might be a gun.

Leavell followed T.S.'s gaze towards Newsom, who walked into an east-west alley. After she heard a yell, she saw Newsom run down the alley with T.S. chasing him. She paid for her gas and drove around the area until she saw movement at the end of an alley between Mozart Street and California Avenue. She turned on her car's bright lights and drove northbound in the alley until she saw two young men beating Newsom in the head.

Newsom, who was wearing a T-shirt and jeans, but no shoes or coat, was lying on the ground while T.S. hit him in the head with a brick. T.S. was wearing dark pants and a shirt with red in it, and the other offender was wearing dark clothing. When Leavell drove up, T.S. looked directly into her car's headlights, then ran away with the second offender.

After Newsom got into Leavell's car, Leavell drove to the Clark station and called 911. She never told the police what she saw that night, but she spoke with an investigator from the State's Attorney's office after receiving a summons to appear in court.

Chicago police officer Robert Graeber testified that on February 2, 1996, he spoke with Newsom. Defendant's attorney objected, arguing that this was inadmissible hearsay and a prior consistent statement being used to bolster Newsom's testimony. The trial court stated that the testimony was not hearsay because it was not being offered for the truth of the matter asserted, but was offered to show why the officers acted as they did.

Graeber testified that he asked Newsom if he had any additional information on T.S., whom he had named in the original case report as one of the offenders. After Newsom told him that one of his friends, Poochie, knew where T.S. lived, Poochie took the officers to T.S.'s house at 7129 South Rockwell. The police went to the house and arrested T.S., read him his *Miranda* rights, and drove him to the police station. While T.S. was sitting in the processing room with several

police officers, Newsom looked into the room and identified T.S. as the person who had robbed him.

On cross-examination, Graeber testified that the police report of another officer stated that one of the offenders was T.S., who was wearing a green and black flannel shirt, and the second offender was wearing a green-gray skull cap, dark coat, and black pants. Graeber admitted that Derrick Thornton had been a suspect in the case but was released when it was learned that he had been in the Audy Home on the night of the incident.

Steve Sapienza, an investigator for the public defender's office, testified that he spoke with Newsom by telephone on March 8, 1996. Newsom told him that he knew T.S. because they went to elementary school together in 1993. Newsom did not mention that he knew T.S. from playing basketball at Marquette Park.

Sapienza also spoke with Leavell by telephone on March 15, 1996. She stated that she saw the offenders only briefly and was never interviewed by the police. When she spoke with an investigator from the State's Attorney's office, she identified the offenders by their clothing. The only thing she remembered telling the investigator was that one of the offenders was wearing something with red in it.

Derrick Thornton testified that he had known T.S. for two years. On February 2, 1996, the police came to his house and drove him to the police station where they placed him in a room alone. The police read him his *Miranda* rights and asked him where the beeper and coat were, then brought Newsom into the room. They asked Newsom whether Thornton was one of the offenders. After Newsom indicated "yes" with his head, the police told Thornton that Newsom had identified him as the offender. At that point, Thornton told the police that he had been in the Audy Home on the night of the incident. While the police checked his story, they put Thornton in the same room with T.S., then released him.

After the close of evidence and closing arguments, the trial court made a finding of delinquency. At sentencing, the trial court adjudicated T.S. to be a violent juvenile offender based on a previous adjudication of delinquency and committed him to the Juvenile Department of Corrections.

■ T.S. asserts on appeal that he was denied a fair trial because the trial court explicitly based its guilty finding on the following non-existent evidence: (1) Newsom testified that he told the police while he was in the hospital that someone named Tywon robbed him; and (2) Poochie identified T.S. as the robber.

We disagree. First, Newsom did testify on redirect examination that he told the police in the hospital that the name of one of the of-

fenders was Tywon. Second, the trial court never stated that Poochie identified T.S. as the offender. Instead, the trial court stated:

"Poochie was the one who basically knew where Tywon lived and took them to the house and showed them the house. So this wasn't a matter of the police going out and bringing in an individual and then asking for a suggestive show up. This is kind of the opposite."

While we recognize that the trial court's comments could have been clearer, we find that they related to defendant's closing argument remarks that the out-of-court identification of T.S. was a suggestive showup. It merely shows that the police arrested the person named in the police report. It never stated that Poochie identified T.S. as one of the offenders. Moreover, a reviewing court must presume that the trial court considered only competent evidence unless the contrary affirmatively appears of record. *People v. Schmitt*, 131 Ill. 2d 128, 137-38, 545 N.E.2d 665 (1989); *People v. Crossley*, 236 Ill. App. 3d 207, 218, 603 N.E.2d 575 (1992). For those reasons, we find that the trial court did not base its finding on nonexistent evidence.

■ Next, T.S. asserts that the trial court improperly used Graeber's testimony about his investigation as substantive evidence even though it was admitted only for the limited purpose of showing the course of the police investigation.

Graeber testified that he spoke to Newsom at his home on February 2, 1996. He stated:

"We asked [Newsom] about the circumstances of the robbery that he had reported. And we asked him if he had any further information on the offender who he had named in the original case report as Tywon, and he stated that one of his friends knew where Tywon lived."

Although the trial court properly overruled the defense counsel's objection because the testimony was being admitted solely to show why Graeber acted as he did, defendant argues it relied on Graeber's testimony as substantive evidence when it stated in its finding:

"Officer Graeber testified, contrary to the arguments made here, that they went to his home and that a friend of Poochie was the one who basically knew where Tywon lived and took them to the house and showed them the house. So this wasn't a matter of the police going out and bringing in an individual and then asking for a suggestive showup. This is kind of the opposite."

As we stated earlier, these comments related to defendant's argument that Newsom's identification of T.S. in the police station was a suggestive showup. Therefore, we conclude that the trial court did not improperly use Graeber's testimony about his investigation as substantive evidence.

■ Next, T.S. asserts that his cross-examination of Newsom was improperly restricted by the trial court because he was not allowed to question Newsom about his bias and motive to give false testimony. Specifically, T.S. argues that he should have been allowed to question Newsom about three felony charges against him that had been stricken with leave to reinstate. One of the charges was for burglary, which was stricken with leave to reinstate (SOL'ed) on May 2, 1994. In addition, charges for burglary and possession of a stolen motor vehicle were SOL'ed on September 27, 1995, and November 8, 1995.

In response, the State argues that the trial court did not abuse its discretion in limiting T.S.'s cross-examination of Newsom because the SOL'ed charges were too remote.

While the scope of the cross-examination rests largely in the discretion of the trial court (*People v. Hudson*, 157 Ill. 2d 401, 435, 626 N.E.2d 161 (1993)), that discretion must be exercised in such a way as to allow the defendant wide latitude in establishing bias, motive, or interest by the witness (*People v. Wilkerson*, 87 Ill. 2d 151, 156, 429 N.E.2d 526 (1981); *People v. Perez*, 209 Ill. App. 3d 457, 470, 568 N.E.2d 250 (1991)). A defendant may question a witness on any matter where it would reasonably tend to indicate that his testimony might be influenced by an interest, bias, or motive to testify falsely. *People v. Triplett*, 108 Ill. 2d 463, 475, 485 N.E.2d 9 (1985); *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 1081, 613 N.E.2d 1253 (1993). Cross-examination to show bias, interest, or motive to testify falsely is a matter of right, which can be precluded only if it is repetitive or harassment of the witness. *Triplett*, 108 Ill. 2d at 475.

Even though the evidence must not be remote or uncertain, the defendant is entitled to inquire into any promises or expectations whether based on fact or imaginary. *Triplett*, 108 Ill. 2d at 475-76; *Perez*, 209 Ill. App. 3d at 470-71. He is not required to show beforehand that any promises of leniency had actually been made or that any expectations of special favor existed in the mind of the witness. *People v. Harris*, 123 Ill. 2d 113, 147, 526 N.E.2d 335 (1988); *Triplett*, 108 Ill. 2d at 476; *Perez*, 209 Ill. App. 3d at 470.

Evidence of an arrest is admissible to show that the witness's testimony may be influenced by bias, interest, or motive to testify falsely. *Triplett*, 108 Ill. 2d at 475. A defendant is denied his constitutional right to confront the witnesses against him when the trial court precludes him from questioning a witness about those arrests that have been stricken with leave to reinstate if they could have been reinstated against the witness at the time of the trial. *Triplett*, 108 Ill. 2d at 482-83. The State may reinstate a cause that has been stricken with leave to reinstate if done within the limita-

tion period, which is three years for a felony prosecution. *Triplett*, 108 Ill. 2d at 482.

Accordingly, T.S. should have been allowed to fully cross-examine Newsom about any motivation he may have had to lie and whether he contemplated any leniency because of his testimony. The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 353, 94 S. Ct 1105, 1110 (1974). All of the SOL'ed charges could have been reinstated at the time of the trial. Therefore, T.S. was entitled to try to establish that Newsom might be biased because he hoped that testifying against defendant would ensure that the felony charges against him would not be reinstated.

Nevertheless, we find this error to be harmless beyond a reasonable doubt since there was no reasonable possibility that the outcome would have been different if T.S. had been allowed to cross-examine Newsom on his SOL'ed charges. *Chapman v. California*, 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827 (1967); *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 11 L. Ed. 2d 171, 173, 84 S. Ct. 229, 230 (1963). The evidence of T.S.'s guilt was overwhelming. There were three eyewitnesses, Newsom, Clarke, and Leavell, who placed T.S. at the scene prior to and during the offense. Leavell, an unbiased witness, and Newsom, the victim, positively identified T.S. as one of the offenders. Furthermore, Newsom knew T.S. prior to this incident because they went to school and played basketball together.

In addition, Newsom, the victim in this case, did not need a promise of leniency by the State's Attorney to testify against T.S. Newsom required medical attention at the hospital as a result of being struck by a brick and a beating he received. His property was stolen from him. Clearly those were the reasons why he testified against T.S. Therefore, we find it was harmless error to not allow T.S. to fully cross-examine Newsom about any promise of leniency given in exchange for testifying against T.S.

For the foregoing reasons, we affirm.

Affirmed.

McNAMARA and BURKE, JJ., concur.