NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240430-U

NO. 4-24-0430

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| BARTON McNEIL, | ) | No. 98CF633 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Lannerd and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court (1) properly granted the
State's motion to partially dismiss defendant's successive postconviction petition
at the second stage and (2) did not manifestly err in denying defendant's petition
after a third-stage evidentiary hearing.

¶ 2    Following a July 1999 bench trial, the trial court convicted defendant, Barton

McNeil, of first degree murder for the death of his daughter, C.M. The court later sentenced

defendant to a term of natural life in prison. On direct appeal, this court affirmed defendant's

conviction, vacated his sentence, and remanded for resentencing. *People v. McNeil*, No.

4-99-0679 (Oct. 24, 2001). On remand, the court resentenced defendant to 100 years'

imprisonment, a sentence we affirmed on appeal (*People v. McNeil*, No. 4-02-0849 (Nov. 4,

2004)). In September 2005, he filed his first *pro se* postconviction petition, which the court

summarily dismissed. We affirmed the dismissal. *People v. McNeil*, No. 4-04-0892 (Mar. 7,

2008). In February 2021, the court granted defendant leave to file a successive postconviction petition, wherein he alleged a claim of actual innocence. In October 2022, the court granted the State's motion to dismiss the petition in part and moved the remainder of the petition to the third stage. In February 2024, the court denied defendant's petition after holding a third-stage evidentiary hearing.

¶ 3    Defendant appeals, arguing the trial court erred by (1) dismissing certain evidence at the second stage of postconviction proceedings and (2) denying his postconviction petition after a third-stage evidentiary hearing. He asks this court to reverse the denial of his postconviction petition and remand for a new trial or, in the alternative, remand for a new evidentiary hearing. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    On the morning of June 16, 1998, defendant called 911 to report finding his three-year-old daughter, C.M., deceased in his bed. Her cause of death was later determined to be asphyxiation by smothering. The autopsy revealed some evidence of sexual abuse. From the start, defendant has maintained Misook Nowlin-Wang, his ex-girlfriend, murdered C.M. out of jealousy and in retaliation for their failed relationship.

¶ 6    In July 1998, a grand jury indicted defendant on two counts of first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 1998)). The indictment alleged defendant, without lawful justification, killed C.M. by smothering her, and in committing the act, he either intended to kill or cause great bodily harm to her or knew his acts created a strong probability of death or great bodily harm.

¶ 7                                    A. Pretrial Proceedings

¶ 8    In December 1998, the State filed a motion *in limine* seeking to exclude evidence

Misook was involved in or committed the murder of C.M. The trial court conditionally granted the State's motion, allowing defendant to make a formal offer of proof to introduce evidence tying Misook to C.M.'s murder.

¶ 9    In March 1999, the trial court held an offer of proof hearing. The defense called Misook to testify. Before her testimony, the court admonished her of her right to remain silent, her right to an attorney, her right to consult with her attorney at any time, and that any testimony could be used against her in later proceedings. Misook indicated she understood and agreed to testify.

¶ 10    Defense counsel elicited the following testimony from Misook. On June 15, 1998, the night before C.M. was murdered, Misook and defendant met for dinner. At dinner, she and defendant got into an argument over several issues. In particular, Misook was upset at defendant for refusing to testify on her behalf at sentencing in a case where she was convicted of committing domestic battery against him. Later the same evening, Misook asked her friend to go with her to defendant's residence, but her friend told her to stay home. Misook denied going to defendant's apartment that night and stated she stayed home alone. However, she went to defendant's residence the morning of June 16, 1998, to retrieve a computer disc. Misook stated she and her daughter, Michelle Nowlin, had been inside defendant's apartment before for three or four playdates with C.M.

¶ 11    The trial court affirmed its original ruling granting the State's motion *in limine*. The court found the evidence regarding "the purported motive" of Misook was "not very strong in terms of commission of a murder to set someone else up." The court further found the other evidence presented was not sufficient to establish "any close enough connection that would allow this to come in in terms of proving [Misook] was the perpetrator as opposed to

[defendant]."

¶ 12                                          B. Bench Trial

¶ 13          Defendant's bench trial was held in July 1999. The evidence at trial established, on June 16, 1998, at approximately 7:45 a.m., officers and emergency personnel responded to a 911 call at defendant's apartment. Defendant reported finding C.M. unconscious and not breathing. Paramedics determined C.M. "had no electrical activity in her heart" and rigor mortis had set in, indicating she had been dead for several hours.

¶ 14          Karen Baker, a police officer with the Bloomington Police Department (BPD), testified the apartment had one bedroom and was located in a one-story building. After entering the bedroom, Officer Baker saw the victim's body lying face up on the bed. Officer Baker did not observe any disturbances consistent with an intruder in the room. The two access points to the bedroom were the north-facing window and the inner door leading to the rest of the apartment.

¶ 15          Thomas Sanders, a detective with BPD, testified he collected evidence and took photographs of the crime scene. When photographing the bedroom window, Detective Sanders observed a collection of dead insects, dust, and spiderwebs attached from the window frame to the mesh screen. The mesh screen had two small cuts in the lower left- and right-hand corners. The photographs from inside the bedroom depicted closed venetian blinds, with some panels turned in opposite directions, and a fan leaning against the wall under the window. From the outside, Detective Sanders did not observe any markings, footprints, trampled bushes, or other disturbances by the window. Other evidence collected by Detective Sanders included two bedsheets, a pillowcase, a potential latent fingerprint on the interior of the bedroom window, C.M.'s T-shirt and underwear, and several forensic swabs.

¶ 16        Randall McKinley, a sergeant with BPD, testified he was contacted by his shift commander on the evening of June 16, 1998, who informed him defendant called and asked to speak to a detective at his residence. After arriving at the residence, defendant told Sergeant McKinley he believed C.M.'s death was a homicide and wanted to show him "how they got in." Defendant pointed out two small holes in the bottom corners of the mesh screen on the bedroom window. Sergeant McKinley shined a flashlight on the bedroom window and observed an accumulation of spiderwebs and dirt on the window frame and mesh screen. He did not observe any scuff marks or mud outside the window and noted the height of the window would make it difficult for someone to crawl through it without assistance. Defendant also brought Sergeant McKinley into the bedroom to show him a fan that was on the floor. Defendant asserted this fan was normally kept in the window. Defendant agreed to speak with detectives at the police department.

¶ 17        Marvin Arnold, a detective with BPD, testified he and several other officers spoke with defendant at the police department on the evening of June 16, 1998. Defendant told the officers he believed Misook was responsible for the death of C.M. Further, defendant asserted he knew the autopsy would reveal C.M. died of asphyxiation or suffocation. At the time of defendant's assertions, the autopsy had not yet been performed. Detective Arnold testified he conducted a recorded interview with defendant the next day around 11 a.m. Prior to the interview, Detective Arnold attended the autopsy and was made aware of the findings indicating external injuries and sexual trauma to C.M. He did not relay those findings to defendant during the interview.

¶ 18        During the recorded interview, which was played for the trial court, defendant repeated his belief that Misook crawled through the bedroom window and murdered C.M. after

- 5 -

he and Misook got into an argument the day before. Defendant stated Misook was always jealous of his relationship with C.M. He admitted although Misook had a history of acting violently, she had never directly threatened C.M. Defendant stated during their relationship, the police were called three or four times due to Misook's violent behavior and she was arrested during the final incident before they broke up. When defendant and Misook lived together, Michelle would stay with them often. Defendant offered the following explanation for how he believed C.M. was killed:

> "The last thing [C.M.] saw was probably a flash of lightning right before somebody put a pillow or—or her Barney doll over her head. And *** I pray that she was asleep when that happened. I don't—and—you can tell me the result of the autopsy, even though I already know what they are. Death by asphyxiation. *** You mark my words, that's what it is. And if *** by golly, if I was the one that did that, I wouldn't be telling you that it was death by asphyxiation. The only reason I know that is because—or I say that is because I know I didn't do it. *** She was smothered with a g*** pillow or something. I mean, there's no signs of trauma, any way, shape, or form."

¶ 19        Defendant then speculated C.M. might have been poisoned, but he thought it was unlikely, as Misook was "not smart enough" to do so. He insisted Misook was the only person with a motive to kill C.M., which he described as her "maniacal desire" to be with him "at any cost," including threatening to kill herself over it. Defendant asserted he knew he was likely the "chief suspect" because he was in the apartment at the time of C.M.'s murder.

¶ 20        Detective Arnold and another officer conducted a second interview with defendant that afternoon. The second interview was not recorded. When Detective Arnold

mentioned "everything would come out and there were some things not right about the body," defendant became angry and responded, "Don't tell me she was molested." Detective Arnold replied, "[W]e didn't say she was molested. You suggested that she was molested."

¶ 21        Dr. Violette Hnilica testified she was the forensic pathologist who performed C.M.'s autopsy. She identified bruising around the victim's mouth, forehead, chin, and back. Under an ultraviolet light, the most prominent bruising appeared in the mid-back area, with deep subcutaneous hemorrhages on both the left and right sides. Dr. Hnilica also found blood in the victim's mouth and nose. She stated the injuries indicated pressure had been applied to the face and back, causing the bruising and superficial abrasions. She also observed petechia, or ruptures of tiny capillaries, around the eyes, which were typically caused by asphyxia and struggling to breathe. Dr. Hnilica identified a contusion on the back of the victim's head. She also observed congestion and edema, or swelling, of the brain and lungs, both of which correlated with asphyxial death. The victim also had numerous very fine petechia in the lungs, which supported a finding of "severe asphyxial process, especially in a child."

¶ 22        Dr. Hnilica next detailed the examination of the victim's genital area. She testified the vagina and anus were dilated and extremely red. The hymen was dilated approximately six millimeters, which indicated stretching. She observed the hymen was lobulated, meaning it had an irregular, scalloped pattern on the upper edge. This also indicated previous stretching or tearing and healing of the hymen. Dr. Hnilica could not state when the injury or scarring had occurred. She found both acute and intense chronic inflammation. The most serious inflammation was present in the vagina, with lesser inflammation around the urethra and anus. Dr. Hnilica explained this type of inflammation was typically caused by intense rubbing with an object outside the body. She testified these findings were very rare in a child that age unless a

parent reported inappropriate behavior, and she opined the cause of the irritation "would be in the realm of molestation." Vaginal swabs revealed blood, which was consistent with injury to the vaginal area. The victim's mother, Tita M., testified she never observed the victim engage in behavior involving touching or playing with her vaginal area.

¶ 23        Dr. Hnilica testified the body came in with panties, bedsheets, and a pillow. The panties had bloody stains in the crotch area, and the flat sheet had "two very prominent bloody fluid spots," which lined up with the victim's face area and genital area. Based on an analysis of her stomach contents, Dr. Hnilica opined C.M. died within two hours of eating. C.M. had no history of medical disease which would have contributed to her death. Dr. Hnilica concluded the cause of death was smothering, as indicated by the bruising, resulting in an asphyxial death.

¶ 24        Susan Kidd, a forensic microscopist with the Illinois State Police (ISP), conducted forensic testing on the hairs found on the victim's left hand, left forearm, and right hand and compared them against sample hairs taken from C.M. and defendant. Three of the hairs from the left hand and forearm were forcibly removed. The hairs exhibited characteristics of a mixed-race, Asian-Caucasian child. Kidd concluded the hairs were consistent with coming from C.M. and could not have originated from defendant.

¶ 25        Jenny Hahn, a forensic scientist with ISP, conducted serology testing of the bedsheets, pillowcase, pillow, and T-shirt. The testing identified human blood and urine on some of the items but excluded the presence of semen. Hahn also conducted serology testing on the vaginal, rectal, and oral swabs collected during the victim's autopsy. The testing identified blood on the vaginal and oral swabs but excluded the presence of semen on all swabs.

¶ 26        Debra Minton, a forensic scientist with ISP, conducted DNA analysis on four bloodstain samples taken from the fitted bedsheet and a strand of hair taken from the victim's left

hand and compared them against samples taken from C.M. and defendant. The DNA profile obtained from the bloodstains and hair matched the DNA profile of C.M. and excluded defendant as a contributor.

¶ 27    The defense called Wayne Downey, the property manager of defendant's apartment building. Downey did not recall previously seeing any large holes in the mesh screen of defendant's bedroom window. However, he stated tenants would often make holes in the corner of the mesh screens to access their units when they were locked out.

¶ 28    Defendant testified on his own behalf. On June 15, 1998, defendant picked C.M. up from Tita's home around 7 p.m. and then stopped by McDonald's to pick up a Happy Meal for C.M. They arrived at defendant's apartment between 7:45 and 8 p.m. Defendant logged on to his computer while C.M. ate her food. He took a nap from around 8:30 to 10:30 p.m. while C.M. looked at books. After waking up from his nap, defendant put C.M. to bed between 10:30 and 10:45 p.m. Defendant stated there was only one bedroom with one bed in the apartment, which is where C.M. slept that night. He explained when C.M. stayed at his apartment, she always slept in the bed, and he always slept on the couch. On rare occasions, C.M. would get up in the middle of the night and sleep with him on the couch. Defendant also stated he would sleep with no clothes on after he and Misook engaged in sexual intercourse at their old apartment. Defendant admitted C.M. climbed into bed with them "once or twice" when they were not wearing clothes but insisted he "did not routinely sleep naked nor did [he] routinely sleep naked with [C.M.]"

¶ 29    After putting C.M. to bed, defendant returned to "messing around" on his computer in the living room. Defendant recalled the weather was "extremely warm" that night. He had the table fan in the living room turned on, but he had the window fan in the bedroom turned off. He stated the bedroom fan was in the window when he put C.M. to bed. Around

midnight, he walked past C.M.'s room and saw her sitting up in bed and smiling. Defendant pulled the covers back over C.M. and told her to go back to sleep. At approximately 2 a.m., defendant checked on C.M., who was asleep. He went back to the living room and went to sleep on the couch. Defendant heard heavy thunder between 2:15 and 2:30 a.m., so he did not fall asleep until 2:45 a.m. Darcy Loy, an official observer for the National Weather Service, testified weather data from June 16, 1998, showed periods of rain between 3 a.m. and 7 a.m.

¶ 30 Defendant's alarm went off at 7:10 a.m. and again at 7:19 a.m. He got up and called to C.M. to wake up before taking a shower. Afterward, defendant called to C.M. a second time to wake up, as she had not moved. Defendant stated he walked into the bedroom and realized "she was not alive anymore." He found C.M. lying on her back with one eye open and the other partially open, and she was cold to the touch. Defendant ran to the living room and called 911 to request paramedics. He attempted to perform cardiopulmonary resuscitation (CPR) by blowing into C.M.'s mouth. He had no CPR training. Defendant saw blood running from her nose during his attempt.

¶ 31 The paramedics and police officers arrived shortly thereafter. Defendant testified Misook "showed up too for some unexplained reason." He recalled C.M. was wearing the same clothing she was wearing the night before—one of defendant's T-shirts and a pair of white panties. Defendant stated he did not examine the bedroom window during the entire morning. Around noon, Misook "showed up for the second time. Stayed fifteen minutes or so and then left." After the body was removed from his apartment, defendant went over to Tita's home. Defendant testified he returned to his apartment between 5 and 6 p.m. the same day to pick up some clothing and because he "was beginning to feel that [C.M.]'s death might not have been by natural causes." Upon his return, he noticed two holes in the mesh screen in the bedroom

window, a dark mark below the window, and the window fan on the floor of the bedroom. It was then that he called the detectives to relay his suspicion C.M. was murdered.

¶ 32 The trial court found defendant guilty of both counts of first degree murder. The court rejected defendant's theory that an intruder accessed the residence through the bedroom window. In particular, the court noted evidence of dust and cobwebs on the window frame and mesh screen that would have been disturbed if an intruder had removed the screen. The property manager explained the holes in the window screen were made by tenants to gain entry to their units after locking themselves out. The court also noted defendant's theory was inconsistent with C.M.'s time of death. The court found defendant's suspicious behavior immediately after C.M.'s death was further evidence of his guilt. Before the cause of death was determined, defendant repeatedly insisted C.M. was murdered by smothering. Defendant also alluded to molestation when police suggested "there was something not right about the body."

¶ 33 The trial court sentenced defendant to a term of natural life in the Illinois Department of Corrections.

¶ 34 C. Direct Appeal and Initial Postconviction Petition

¶ 35 Defendant appealed, arguing (1) the trial court erred in excluding evidence that Misook had the motive and opportunity to kill and sexually abuse C.M. and (2) his life sentence was based on an unconstitutional statute. This court affirmed defendant's conviction, finding the excluded evidence showed no clear connection between Misook and C.M.'s death. However, the court vacated his sentence and remanded for resentencing. *McNeil*, No. 4-99-0679 (Oct. 24, 2001). In July 2002, the trial court resentenced defendant to 100 years' imprisonment, and the sentence was affirmed on appeal. *McNeil*, No. 4-02-0849 (Nov. 4, 2004).

¶ 36 In September 2005, defendant filed a *pro se* postconviction petition, alleging

(1) his trial counsel provided ineffective assistance, (2) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), and (3) his jury waiver was not knowing and voluntary. Defendant attached an affidavit to his petition which averred, among other facts, (1) he and Misook lived together for three years, (2) during those three years, C.M. and Michelle had frequent overnight stays where they would sleep together on the mattress in the extra bedroom, and (3) after he and Misook broke up, defendant took the same mattress to his new apartment to use as his bed. His affidavit also averred that on June 9, 1998, one week before C.M. was murdered, Misook spent the night at defendant's apartment.

¶ 37    The trial court summarily dismissed the petition, and we affirmed the dismissal. *McNeil*, No. 4-04-0892 (Mar. 7, 2008).

¶ 38                    D. Motion for Forensic Testing

¶ 39    In November 2013, defendant filed a motion for postconviction forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2012)). With the agreement of the State, the trial court entered an order for DNA testing of (1) five untested blood and urine stains on the bedsheet and (2) bloodstains on the pillowcase. The court entered a subsequent order for DNA testing of the (1) latent fingerprint found inside the bedroom window, (2) window screen, (3) bedsheet itself, and (4) pillowcase itself. The court denied defendant's request for additional forensic testing of C.M.'s underwear and T-shirt.

¶ 40    An October 2015 report detailed the testing results of the fitted bedsheet, pillowcase, T-shirt, and latent fingerprint. The DNA testing determined the DNA profile obtained from the swabs of the fitted bedsheet and pillowcase contained a mixture of at least three individuals. Defendant, Misook, and C.M. could not be excluded as contributors. Misook was excluded as a contributor to the partial DNA profile obtained from the urine stain on the

- 12 -

T-shirt. Serology testing of the T-shirt determined the presence of semen was inconclusive. No suitable DNA profile was obtained from the latent fingerprint on the bedroom window.

¶ 41    A July 2016 report detailed the results of a mitochondrial DNA (mtDNA) analysis of the hair found inside the pillowcase. The partial mtDNA profile obtained from the hair was consistent with the mtDNA profile obtained from Misook and excluded defendant as a contributor. The report noted, "[mtDNA] is inherited maternally. A mtDNA match cannot exclude any maternal relatives."

¶ 42                    E. Successive Postconviction Petition

¶ 43    In February 2021, defendant filed a *pro se* motion for leave to file a successive postconviction petition, which the trial court granted. The petition alleged a claim of ineffective assistance of counsel and, relevant here, a claim of actual innocence based on newly discovered evidence. In his petition, defendant argued the newly discovered evidence supported the theories that C.M. was not sexually abused and that Misook was responsible for the murder.

¶ 44    In support, defendant attached various documents to his petition. Relevant to this appeal, defendant attached an affidavit and report completed by Dr. Nancy Harper, a pediatrician and child abuse expert. According to the report, Dr. Harper concluded there was no evidence suggesting C.M. had been sexually abused. In his petition, defendant argued Dr. Harper's report supported his claim, as it undermined the credibility of Dr. Hnilica's testimony regarding defendant's alleged motive.

¶ 45    Defendant also attached the October 2015 and July 2016 postconviction DNA testing reports. In his petition, defendant argued the DNA evidence supported his claim, as it showed a direct connection between Misook and C.M.'s death by placing Misook in the bedroom. He further argued the trial court, if presented this evidence, would have denied the

State's motion to exclude evidence of Misook's culpability at trial.

¶ 46     In his petition, defendant asserted Misook's September 2011 murder of Linda Tyda, her 70-year-old mother-in-law, supported his claim because it occurred under similar circumstances, with a similar motive, and established her tendency to commit violent acts. Misook was convicted of the murder in December 2012, after she strangled Tyda to death during a heated argument and later buried the body in a shallow grave. Misook also pleaded guilty to concealment of a homicidal death. While awaiting trial, Misook confessed to Michelle, telling Michelle she believed her husband, Don Wang, was having an affair with one of Tyda's employees. She also confessed to a correctional officer.

¶ 47     Defendant also attached affidavits from Michelle and Dawn Nowlin. (Dawn is Michelle's stepmother who is married to Michelle's biological father, Andy Nowlin.) The affidavits stated Don Wang, Tyda's son and Misook's husband at the time, told them at Tyda's funeral Misook had confessed to killing C.M. Finally, defendant claimed each piece of new evidence or, in the alternative, the totality of the new evidence, was sufficient to entitle him to a new trial.

¶ 48                    1. *Second-Stage Proceedings*

¶ 49     In April 2022, the State filed a motion to partially dismiss defendant's successive postconviction petition. The State agreed Dawn's and Michelle's affidavits should move to the third stage but argued the rest of the evidence did not meet the standard for newly discovered evidence to support an actual innocence claim.

¶ 50     In October 2022, the trial court issued a written order granting the State's motion in part, dismissing Dr. Harper's report, the DNA evidence, and evidence of Misook's murder of Tyda. The court also dismissed the ineffective assistance of counsel claim. Based on the State's

agreement, the court moved Dawn's and Michelle's affidavits to the third stage. The court also moved defendant's totality of the evidence claim to the third stage only as it pertained to Dawn's and Michelle's affidavits.

¶ 51      The trial court dismissed the remaining evidence as follows. The court found the DNA evidence was not newly discovered evidence because it was not conclusive. Because the hair was subjected to mtDNA testing, Michelle could not be excluded as a contributor. In addition, the court found the DNA evidence from the pillowcase and bedsheet was not conclusive nor likely to change the result on retrial, as defendant and Misook used to live together during a long-term relationship and, despite breaking up, they continued to interact with each other. The court found Dr. Harper's report was not newly discovered evidence, not likely to change the result on retrial, and forfeited and/or barred by *res judicata*. Specifically, the court noted the report cited sources which were available at the time of the trial or the initial postconviction petition and could have been discovered through due diligence. Finally, the court found Misook's 2011 murder of Tyda was not newly discovered evidence because it was not material or conclusive, as the murder occurred 13 years after the murder of C.M. and was not relevant or probative as to defendant's innocence in the present case.

¶ 52                    2. *Third-Stage Evidentiary Hearing*

¶ 53      The third-stage evidentiary hearing was held in November 2023. The defense called three witnesses: Michelle, Dawn, and Misook.

¶ 54      Michelle testified Misook was her mother, who was presently incarcerated for the murder of Tyda. Approximately 12 years ago, when Michelle was around 22 years old, she attended a "celebration of life" for Tyda. During the event, Michelle, Andy, Dawn, and Don went to another room for a conversation. Michelle recalled Don "just out of the blue" told her

Misook had told him that she had killed C.M. Michelle observed Don "was in a very hard place at the time." She stated she did not "know if he said that just to make me not like my mom or—I don't know what his intentions were." On cross-examination, Michelle testified the conversation with Don occurred shortly after Tyda's death.

¶ 55 Dawn testified that while attending the celebration of life for Tyda, she spoke with Michelle and Don. Don told her and Michelle that during a "big fight," Misook confessed to killing C.M. When asked whether Don heard Misook say anything more specific about the murder, Dawn stated she only recalled Don saying "[t]hat it was just a very heated argument and that [Misook] said she killed [C.M.]"

¶ 56 Before Misook testified, the trial court advised her because she had the right to an attorney, the court had appointed the public defender to represent her. The court confirmed she had sufficient time to confer with her attorney before the hearing. The court warned Misook a transcript of the proceeding would be prepared and anything she said could be used against her in future proceedings. On direct examination, Misook invoked her fifth amendment (U.S. Const., amend. V) privilege in response to every question by defense counsel.

¶ 57 The State called Steven Fanelli, a former detective with BPD. In February 2012, he conducted a recorded interview of Don during the investigation of the murder of Tyda. In the recorded interview, portions of which were played for the trial court, Detective Fanelli asked Don if Misook ever discussed the circumstances of C.M.'s death during the time they were dating or married. Don replied Misook never talked about C.M. When asked if Misook ever confessed to killing C.M., Don stated, "Not that I remember if she said something like that." When asked if he ever told anyone Misook confessed to killing C.M., Don shook his head and replied, "I don't believe so," and "No."

¶ 58 Don then asked Detective Fanelli, "Confess means you tell me the whole story and how she did it?" Detective Fanelli responded, "Yeah, or, okay, did she ever without telling you the whole story, did Misook ever tell you something like 'I killed [C.M.]' Did Misook ever say that to you?" Don responded, "Not to my knowledge *** Really. Not to my knowledge at all." He insisted he would remember if Misook ever confessed during their marriage. Detective Fanelli confirmed Don never recanted the recorded statements. On cross-examination, the defense played a portion of the recorded interview where Don expressed his belief Misook had the capability to commit murder.

¶ 59 In February 2024, the trial court issued a written order denying defendant's successive postconviction petition. In its recitation of the facts, the court noted Misook invoked her fifth amendment privilege in response to defense counsel's questions. The court found Dawn's and Michelle's testimony constituted newly discovered evidence. However, the court determined the new evidence was insufficiently conclusive to place the trial evidence in a different light or undermine the court's confidence in the guilty verdict. The court also found the testimony would not be admissible at retrial.

¶ 60 This appeal followed.

¶ 61 II. ANALYSIS

¶ 62 On appeal, defendant argues the trial court erred in (1) dismissing certain evidence at the second stage of postconviction proceedings and (2) denying his successive postconviction petition after a third-stage evidentiary hearing.

¶ 63 A. Second-Stage Proceedings

¶ 64 Defendant claims the trial court erroneously dismissed certain evidence at the second stage of postconviction proceedings.

¶ 65    The Post-Conviction Hearing Act (Act) (725 ILCS 122-1 *et seq.* (West 2022)) provides a three-stage procedure "by which a defendant can pursue a claim that his conviction or sentence was based on a substantial denial of his constitutional rights." *People v. Clark*, 2023 IL 127273, ¶ 38. The Act contemplates the filing of only one petition without leave of court. 725 ILCS 5/122-1(f) (West 2022). However, the trial court may grant a defendant leave to file a successive postconviction petition when a defendant sets forth a claim of actual innocence. 725 ILCS 5/122-1(f) (West 2022); *People v. Sanders*, 2016 IL 118123, ¶ 24. If leave to file is granted, the court then dockets the petition for second-stage proceedings. *People v. Robinson*, 2020 IL 123849, ¶ 43.

¶ 66    At the second stage of postconviction proceedings, the defendant bears the burden of making a substantial showing of actual innocence. *People v. Domagala*, 2013 IL 113688, ¶ 35. "All well-pleaded facts that are not positively rebutted by the trial record are taken as true; the trial court does not engage in any fact-finding or credibility determinations." *People v. House*, 2023 IL App (4th) 220891, ¶ 77. "The question raised in an appeal from an order dismissing a postconviction petition at the second stage is whether the allegations in the petition, liberally construed in favor of the [defendant] and taken as true, are sufficient to invoke relief under the Act." *Sanders*, 2016 IL 118123, ¶ 31. The standard at the second stage of postconviction proceedings is the same for initial petitions and successive petitions. *Sanders*, 2016 IL 118123, ¶ 37.

¶ 67    The defendant must support his actual innocence claim with evidence that is "(1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47. Evidence is newly discovered if it was discovered after the trial and could not have been discovered earlier

through due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Material evidence is relevant and probative of the defendant's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative evidence adds to what the fact finder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is of a conclusive character if, when considered with the trial evidence, it would probably lead to a different result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 68    A dismissal at the second stage of postconviction proceedings is reviewed *de novo*. *People v. Brooks*, 2021 IL App (4th) 200573, ¶ 34. Under *de novo* review, we perform the same analysis as the trial court would perform. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 69    Defendant first argues the trial court erroneously split his single actual innocence claim into distinct "sub-claims," rather than analyzing it as a single claim. According to defendant, this allowed the court to consider each piece of evidence in isolation and avoid a comprehensive assessment of the evidence as a whole.

¶ 70    Defendant misunderstands the analysis conducted by the trial court at the second stage. We agree when a court assesses an actual innocence claim, it must consider the totality of the newly discovered evidence, along with the evidence presented at trial. *People v. Coleman*, 2013 IL 113307, ¶ 96. However, before reaching the merits of an actual innocence claim, the court must first consider whether each piece of evidence, on its own, meets the standard for newly discovered evidence, and then advance only that evidence to the third stage. *Sanders*, 2016 IL 118123, ¶ 46; *People v. Velasco*, 2018 IL App (1st) 161683, ¶¶ 92, 94. That is precisely what the court did here. Thus, the court followed the proper analysis when assessing the evidence presented by defendant at the second stage.

¶ 71 In the alternative, defendant contends the trial court erred by dismissing certain evidence at the second stage where he claims he made a substantial showing of actual innocence based on newly discovered evidence, warranting an evidentiary hearing. Specifically, he challenges the court's dismissal of the DNA evidence, Dr. Harper's report, and evidence of Misook's 2011 murder of Tyda. We will address whether each piece of evidence was properly dismissed at the second stage.

¶ 72                                    1. *DNA Evidence*

¶ 73 We first consider the DNA evidence from the stains on the fitted bedsheet and the hair inside the pillowcase. "DNA, in and of itself, does not confirm the commission of a crime; rather, it confirms an individual's identity." *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 31. Thus, DNA evidence that does not match a defendant's DNA does not automatically exonerate the defendant. *Rivera*, 2011 IL App (2d) 091060, ¶ 31.

¶ 74 Initially, we note defendant misleadingly refers to the bed as "[C.M.]'s bed" throughout his brief. However, the record otherwise demonstrates this was defendant's bed, which C.M. would sleep in when she was visiting him. This was not a fact at issue at trial and is relevant to whether the DNA evidence meets the requirements of newly discovered evidence, as discussed below.

¶ 75 Here, we conclude the DNA evidence from the bedsheet does not meet the materiality requirement for newly discovered evidence. At trial, defendant testified he and Misook never had sexual intercourse at his apartment. However, in his affidavit attached to his initial *pro se* postconviction petition, defendant averred to facts which explained the presence of Misook's DNA on the fitted bedsheet, including that (1) Misook "spent the night" at his apartment approximately seven days before the murder and (2) the mattress was kept in the extra

- 20 -

bedroom of their shared apartment during the three years they lived together. Given the mattress had come from their shared apartment and given Misook's recent presence in defendant's apartment, it was expected that Misook's DNA would be found on defendant's bed. Thus, this evidence is neither probative nor relevant as to whether Misook entered the bedroom at the time of C.M.'s death.

¶ 76 Similarly, we conclude the mtDNA evidence from the hair in the pillowcase was not material. Unlike the stains on the fitted bedsheet, the hair inside the pillowcase was analyzed using mtDNA testing. As noted in the report summarizing the mtDNA findings, "[mt]DNA is inherited maternally. A mtDNA match cannot exclude any maternal relatives." This means although the mtDNA test of the hair could not exclude Misook as a contributor, it also could not exclude Michelle, who is a maternal relative of Misook. Defendant acknowledged in his initial petition Michelle frequently slept in the bed with C.M. during the three years he lived with Misook, and Misook testified at the offer of proof hearing Michelle had several play dates at defendant's apartment with C.M. Thus, the mtDNA evidence is not probative of defendant's innocence, as the mtDNA findings do not sufficiently establish whether the hair came from Misook or Michelle.

¶ 77 Even if we were to conclude the DNA evidence from the bed sheet and the mtDNA hair evidence were newly discovered evidence, when considered with the trial evidence, they were not of such conclusive character that they would probably change the result on retrial. See *Sanders*, 2016 IL 118123, ¶ 47 (clarifying the defendant's new evidence must be "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt"). The presence of Misook's DNA on the bed does not place in a different light the evidence of dust and spiderwebs collected on the window screen, which would have been

disturbed if an intruder had crawled through the bedroom window. Further, the small holes in the corner of the mesh screen were, as explained by the property manager, a common method by which tenants accessed their apartments if they were locked out of their building. The DNA evidence likewise does not place in a different light defendant's suspicious behavior following the murder, most specifically, his insistence to detectives that C.M. was smothered to death before he knew the results of the autopsy. Further, defendant, by his own admission, was the only other person besides C.M. present in the apartment during the entire night, and he was sleeping in the room right next to where C.M. was murdered. Therefore, the trial court did not err in dismissing the DNA evidence at the second stage.

¶ 78                                  2. *Dr. Harper's Report*

¶ 79          We next consider Dr. Harper's report regarding the sexual abuse evidence. The defendant bears the burden to show the evidence was not available at trial or during the initial postconviction petition and could not have been discovered sooner through the exercise of due diligence. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21. Proposed testimony which merely conflicts with trial evidence does not meet the newly discovered standard. *Sanders*, 2016 IL 118123, ¶ 52.

¶ 80          Here, we conclude Dr. Harper's report is not newly discovered, as it relies on information which was available at the time of the trial or initial postconviction petition. Defendant characterizes the report as "new," based on its conclusion that " 'there was a debate in the literature' about these issues" at the time of defendant's trial. This does not accurately reflect the report's findings. As to whether "there was a debate in the literature," this statement referred specifically to the debate on "the significance of the transverse or horizontal measurement of the hymen." This statement was immediately followed with: "However, many authors *by the time of*

*the postmortem examination* were already publishing an association between an increasing hymenal diameter and increasing age." (Emphasis added.) Additionally, the report stated the finding of a lobulated hymen was considered a normal variant in children and "well published in the literature *as early as 1995*." (Emphasis added.)

¶ 81        As to the finding of erythema, or redness of the genital tissue, the report explained this was a nonspecific finding that "was well published in the literature *at the time of the postmortem examination* and a common finding in girls with or without a history of sexual abuse." (Emphasis added.) The report further stated, citing a 1996 study, "[W]hile the scientific community remains concerned that total anal dilation *** may have association with sexual abuse[ ], this is a common and well published finding on postmortem examination." Rather than present new evidence, the report merely contradicts Dr. Hnilica's interpretation of the autopsy findings and relies on authorities which were available at the time of the trial and could have been discovered through due diligence. Therefore, Dr. Harper's report cannot constitute newly discovered evidence.

¶ 82        Even if we were to conclude Dr. Harper's report was newly discovered evidence, when considered with the trial evidence, it was not of such conclusive character that it would probably lead to a different result on retrial. During the trial, the State presented the sexual abuse evidence as a possible motive for C.M.'s murder. However, "[i]t has long been recognized *** that motive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder." *People v. Smith*, 141 Ill. 2d 40, 56 (1990). In rendering its verdict, the trial court noted, although "the State's evidence did show sexual misconduct as a possible motive," the State was nevertheless not required to prove motive. Instead, the court based its guilty verdict on the evidence showing C.M. was smothered

to death, the implausibility of defendant's intruder theory, and defendant's suspicious behavior in the hours after the murder. Whether C.M. was sexually abused in connection with her murder does not place any of this other evidence in a different light, such that it would probably lead to a different result. Therefore, the court did not err in dismissing Dr. Harper's report at the second stage.

¶ 83                          3. *Misook's 2011 Murder of Tyda*

¶ 84            Finally, we consider the evidence of Misook's 2011 murder of Tyda. We conclude this evidence is not material, as it is neither relevant nor probative of defendant's innocence in this case. Defendant insists the facts of C.M.'s and Tyda's murders "bear extraordinary similarities." He argues had the trial court been presented with this evidence, it would have denied the State's motion to exclude evidence of Misook's culpability at trial. We disagree. At the time of their deaths, C.M. was a 3-year-old girl, while Tyda was a 70-year-old woman. C.M. was silently smothered to death in the middle of the night, whereas Tyda was strangled during a heated argument. C.M.'s body was left to be discovered in the bedroom, while Misook concealed Tyda's body by burying her in a shallow grave. There was some evidence C.M. was sexually abused, whereas there was no indication Tyda was sexually abused. Finally, Misook made multiple confessions to murdering Tyda and concealing the body, but she has consistently maintained her innocence in connection with C.M.'s murder. Ultimately, Misook murdered Tyda in a separate offense, under factually distinct circumstances, 13 years after the murder of C.M. Therefore, this evidence is not material and does not support defendant's claim of actual innocence.

¶ 85                          B. Third-Stage Proceedings

¶ 86            Defendant also contends the trial court manifestly erred in denying his successive

postconviction petition after a third-stage evidentiary hearing.

¶ 87 "[T]he primary purpose of a third-stage hearing is to test the reliability, credibility, or veracity of the new evidence and determine whether the new evidence is compelling enough to place the trial evidence in a new light and undermine confidence in the finding of guilt." *House*, 2023 IL App (4th) 220891, ¶ 94. At the third stage, unlike the first and second stages, the allegations in the petition are not taken as true. *House*, 2023 IL App (4th) 220891, ¶ 78. Rather, "the [trial] court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Domagala*, 2013 IL 113688, ¶ 34. The defendant bears the burden to demonstrate actual innocence by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92.

¶ 88 To succeed on a claim of actual innocence at the third stage, "the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Coleman*, 2013 IL 113307, ¶ 96. If the trial court determines the evidence is new, material, and noncumulative, it "then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97.

¶ 89 Defendant acknowledges the denial of a postconviction petition following a third-stage evidentiary hearing is reviewed for manifest error. He nevertheless asks this court to review the trial court's denial of his petition at the third stage under a *de novo* standard based on alleged "errors of law" and the court's decision to ignore "certain issues altogether." However,

he fails to cite any case law where a reviewing court applied a *de novo* standard when examining a third-stage denial. As such, we decline to do so here. Instead, we review the court's decision to deny relief following a third-stage evidentiary hearing for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. A decision is manifestly erroneous when the opposite conclusion is clearly apparent. *Coleman*, 2013 IL 113307, ¶ 98. "This deferential standard of review reflects the understanding that the trial court is in the best position to observe and weigh the credibility of the witnesses." *House*, 2023 IL App (4th) 220891, ¶ 78.

¶ 90                                    1. *Dawn's and Michelle's Testimony*

¶ 91        The State does not dispute Dawn's and Michelle's testimony was new, material, and noncumulative. As such, we only address whether Dawn's and Michelle's testimony was of such conclusive character that it would likely change the result on retrial.

¶ 92        In its written order denying defendant's petition following the third-stage evidentiary hearing, the trial court determined Dawn's and Michelle's testimony was not of such conclusive character that it would likely change the result of defendant's conviction at a new trial. The court based its decision largely on finding Dawn's and Michelle's testimony would not be admissible at a retrial.

¶ 93        Defendant argues the trial court manifestly erred in considering at all whether the evidence would be admissible at a new trial.

> "In determining the weight to be given the new evidence and whether all the evidence, new and old, is so conclusive that it is more likely than not that no reasonable juror would find defendant guilty beyond a reasonable doubt on retrial, the court at the third stage must necessarily consider whether the new evidence would ultimately be admissible at a retrial." *Velasco*, 2018 IL App (1st) 161683,

¶ 118.

See *Brooks*, 2021 IL App (4th) 200573, ¶ 61 (stating the admissibility analysis of new evidence should be reserved for the third-stage evidentiary hearing, where the court determines whether the evidence would be admissible at retrial). Therefore, it was not just appropriate but also necessary for the court to consider the trial admissibility of the new evidence at the third stage of proceedings.

¶ 94    In response, defendant contends our supreme court's holding in *Robinson* contradicts *Brooks* and *Velasco* and should thus control on this issue. In *Robinson*, our supreme court considered an appeal from a denial of leave to file a successive postconviction petition, where the defendant alleged actual innocence and attached several affidavits to his petition. *Robinson*, 2020 IL 123849, ¶ 38. In one of the affidavits, the affiant averred to a third individual confessing to the murder the defendant was convicted of. *Robinson*, 2020 IL 123849, ¶ 77. In their briefs, the parties argued over whether the confession would be admissible at a new trial. *Robinson*, 2020 IL 123849, ¶ 77. In its decision, the *Robinson* court held:

> "The final determination as to the admissibility of [the] extrajudicial confession cannot, and should not, be made until after petitioner has overcome the hurdles of second- and third-stage proceedings. Accordingly, questions regarding the admissibility and reliability of such evidence are not relevant considerations at the motion for leave to file stage of a successive postconviction proceeding." *Robinson*, 2020 IL 123849, ¶ 81.

¶ 95    *Robinson* does not support defendant's contention. *Robinson* addresses only whether the trial admissibility of new evidence is a proper consideration at the petition for leave to file stage. As such, the *Robinson* court did not hold the admissibility of new evidence can

*never* be considered at any stage of postconviction proceedings. Rather, it held questions regarding the admissibility of new evidence were not relevant at the petition for leave to file stage. *Robinson*, 2020 IL 123849, ¶ 81. In contrast, *Brooks* and *Velasco* directly addressed the issue of whether the trial admissibility of new evidence is a proper consideration at the third-stage evidentiary hearing. *Brooks*, 2021 IL App (4th) 200573, ¶ 61; *Velasco*, 2018 IL App (1st) 161683, ¶ 118. Therefore, we find *Robinson* does not contradict the holdings of *Brooks* or *Velasco*, and the court likewise did not err in conducting a trial admissibility analysis at the third stage.

¶ 96        We next address whether the trial court manifestly erred in concluding Dawn's and Michelle's testimony would not be admissible at a retrial. In its written order, the court reasoned that to bring in their statements, defendant would first have to call Don as a witness. Upon Don testifying that Misook never confessed to him, defendant would then have to call Dawn and Michelle as witnesses to attempt to impeach Don's testimony.

¶ 97        Because Dawn's and Michelle's testimony constitutes double hearsay that would be offered for the truth of the matter asserted, their testimony could not be considered as substantive evidence. See Illinois Rule of Evidence 805 (eff. Jan. 1, 2011) (stating hearsay within hearsay is not admissible unless each part of the combined statements conforms with an exception to the hearsay rule). However, Illinois Supreme Court Rule 238 (eff. Apr. 1, 1982) provides, "The credibility of a witness may be attacked by any party, including the party calling the witness." Before a party may impeach its own witness with a prior inconsistent statement, the party must "show that the witness's testimony has damaged its position." *People v. Leonard*, 391 Ill. App. 3d 926, 933 (2009). In other words, the witness's testimony must have given "positive aid to an adversary's case." (Internal quotation marks omitted.) *People v. Cruz*, 162 Ill. 2d 314,

360 (1994). Witness testimony is not affirmatively damaging when it is "merely negative in its effect on the examiner's case." *Cruz*, 162 Ill. 2d at 360. Whether a witness's prior statement is inconsistent with his trial testimony is a matter within the discretion of the trial court. *People v. Singleton*, 367 Ill. App. 3d 182, 191 (2006).

¶ 98 We conclude the trial court's finding that Dawn's and Michelle's testimony would be inadmissible was not manifest error, as Don's testimony would only fail to support, rather than damage, defendant's theory of the case. As such, he could not be impeached with Dawn's and Michelle's testimony. Rather, the only purpose defendant has for introducing their testimony would be "to bring inadmissible hearsay to the attention of the jury," specifically, that Misook allegedly confessed to murdering C.M. *People v. Weaver*, 92 Ill. 2d 545, 563 (1982). For these reasons, we cannot say the court's determination that Dawn's and Michelle's testimony would be inadmissible at retrial is so erroneous that the opposite conclusion is clearly evident.

¶ 99 Defendant also argues the trial court manifestly erred in assuming Don would testify at a new trial consistently with his statements to Detective Fanelli. Defendant fails to recognize it was *his* burden at the evidentiary hearing to prove it was more likely than not he was actually innocent. *Coleman*, 2013 IL 113307, ¶ 92. He could have called Don to testify at the evidentiary hearing, but he chose not to. Moreover, at the third stage, the court "serves as the fact finder, and, therefore, [must] determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Domagala*, 2013 IL 113688, ¶ 34. The court was well within its role as the fact finder to give more weight to Detective Fanelli's testimony over Dawn's and Michelle's testimony when resolving the issue of how Don might testify at a retrial.

¶ 100 Defendant next contends the trial court erred by failing to examine how Dawn's

and Michelle's testimony would change the outcome of the offer of proof hearing and the court's decision to exclude evidence of Misook's culpability. The court's written order did not specifically state whether Dawn's and Michelle's testimony might change the outcome of the offer of proof hearing. However, the court ultimately determined defendant did not meet the "conclusive character" element, which is "the most important element" of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47. In its recitation of the facts, the court noted Michelle was skeptical of Don's intentions and that he was in an emotionally fraught state at the time. The court further noted Dawn could not recall any specifics about Don's statement beyond Misook confessing during a "big fight." Finally, the court included a portion of the transcript from the recorded interview with Detective Fanelli, where Don repeatedly denied Misook ever confessed to murdering C.M. The court's factual findings highlight the unreliability of Don's statements to Dawn and Michelle and call into question the weight attributable to this evidence. Based on our examination of the record, we find the court, as the trier of fact, could have reasonably determined Dawn's and Michelle's testimony lacked reliability and would not change the court's decision to exclude evidence of Misook's culpability.

¶ 101    Finally, even if Dawn's and Michelle's testimony was admissible at a new trial, this evidence is not of such conclusive character that it would probably change the result on retrial. Their testimony does not affect the evidence that an intruder could not have entered through the bedroom window, which defendant claimed is the only way Misook could have accessed defendant's apartment. Their testimony also does not affect defendant's suspicious behavior following the death, including his premature insistence during police interviews that C.M. was smothered to death and possibly subjected to molestation before he knew the results of the autopsy. On the record before us, we cannot say the trial court's conclusive character finding

was manifestly erroneous.

¶ 102                              2. *Misook's Refusal to Testify*

¶ 103          Defendant next argues the trial court improperly failed to consider Misook's invocation of the fifth amendment as newly discovered evidence. Initially, we note defendant cites no case law supporting his assertion a witness's invocation of the fifth amendment may constitute new evidence. See *Elder v. Bryant*, 324 Ill. App. 3d 526, 533 ("Contentions that are supported by some argument, yet lack citations of authority, do not meet the requirements of [Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020)]."). We find defendant has forfeited any argument the court erred by not treating Misook's invocation of the fifth amendment as new evidence.

¶ 104          However, defendant does cite relevant authority for the assertion the trial court abused its discretion by declining to draw an adverse inference from Misook's refusal to testify. See *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 53. The third stage of a postconviction proceeding is civil in nature, meaning the fifth amendment does not prevent the drawing of an adverse inference against a party who refuses to testify. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85. Whether to draw an adverse inference when a party refuses to testify is a matter within the court's discretion. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 53. However, "a failure to draw an adverse inference may be error, even though the inference is permissive, if there is no good reason why the inference should not have been drawn." *Gibson*, 2018 IL App (1st) 162177, ¶ 86.

¶ 105          At the time of the evidentiary hearing, Misook had a pending postconviction appeal in her own criminal case. As noted by the trial court, her answers at defendant's hearing could be used against her in future proceedings, which would include her own postconviction

proceeding. This fact alone provides a sufficient reason as to why Misook refused to testify after receiving advice from her public defender. On this basis, the court had a good reason to not draw an adverse inference. Notably, Misook willingly testified at the March 1999 offer of proof hearing, even after being admonished of her right to remain silent, and when she knew defendant wanted to accuse her of C.M.'s murder at his trial. Accordingly, we find the trial court did not abuse its discretion by declining to draw an adverse inference from Misook's refusal to testify.

¶ 106                    3. *Totality of the Evidence*

¶ 107        Finally, defendant argues the totality of the new evidence warrants a new trial. We have concluded the DNA evidence, Dr. Harper's report, and evidence of Misook's 2011 murder of Tyda were properly dismissed at the second stage. We have also concluded the trial court did not abuse its discretion by declining to draw an adverse inference from Misook's refusal to testify at the evidentiary hearing. This leaves Dawn's and Michelle's affidavits and testimony, which we have already analyzed together and determined do not place the trial evidence in a new light or undermine our confidence in the judgment of guilt. Therefore, any further analysis of the totality of the evidence is unnecessary.

¶ 108        Accordingly, we find the trial court did not manifestly err in its denial of defendant's petition following a third-stage evidentiary hearing.

¶ 109                    III. CONCLUSION

¶ 110        For the reasons stated, we affirm the trial court's judgment.

¶ 111        Affirmed.